NORTH AMERICAN VAN LINES, INC., Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. No. F 75–31.

United States District Court, N. D. Indiana, Fort Wayne Division.

April 20, 1976.

Virgil L. Beeler, Theodore R. Boehm, Michael J. Huston, Indianapolis, Ind., Martin A. Weissert and Terry J. Fewell, Fort Wayne, Ind., for plaintiff.

John R. Wilks, U. S. Atty., Fort Wayne, Ind., John H. D. Wigger, Asst. Atty. Gen.,

Hanford O'Hara and Hugh W. Cuthbertson, ICC, Washington, D. C., for defendants.

## MEMORANDUM OF DECISION AND JUDGMENT

Before PELL, Circuit Judge, and ESCHBACH and SHARP, District Judges.

ESCHBACH, District Judge.

The Interstate Commerce Commission, charged under 49 U.S.C. §§ 306–07 with the duty of issuing certificates of convenience and necessity to carriers of goods in interstate commerce,[1] employs a "flagging" or deferral rule in considering applications for new operating authority submitted by established carriers. Under this practice, when an applicant's fitness has been placed in issue in any formal proceeding or inquiry being conducted by the ICC, final determination and disposition of *any* application for new authority submitted by that carrier is thereafter automatically stayed until the investigation or inquiry is resolved or terminated.[2] North American Van Lines (NAVL) has had some 31 applications stayed under this flagging rule and now seeks a determination that the rule has been improperly applied to it, that the practice should be enjoined, and that the ICC should proceed with the disposition of its applications notwithstanding the pendency of formal investigations and proceedings involving NAVL now before the ICC. Jurisdiction was laid under 28 U.S.C. § 1336. A three-judge court was convened pursuant to 28 U.S.C. §§ 2325 and 2284.[3]

1. 49 U.S.C. § 306(a) provides in part: "no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operations on any public highway . . . unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations . . ."

49 U.S.C. § 307(a) provides in part: "a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied . . . ."

2. *See generally North American Van Lines v. Interstate Commerce Comm'n*, 386 F.Supp. 665, 673 (N.D.Ind.1974).

3. The three-judge requirement of 28 U.S.C. § 2325 was repealed by Pub.L.No. 93–584, § 7, 88 Stat. 1918 (Jan. 2, 1975); however, the savings clause of that Act provided that until the effective date of the repealer all suits filed would still fall under the three-judge requirement. This suit was filed two days before the effective date of the repealer.

This suit is, to an extent, the outgrowth of an earlier challenge by NAVL to the ICC flagging practice. *See North American Van Lines v. Interstate Commerce Comm'n,* 386 F.Supp. 665 (N.D.Ind.1974). The factual background and statement of issues presented in that opinion are applicable here as well.[4]

### Factual Background

North American Van Lines transports diverse goods in interstate commerce, subject to approval by the ICC. It is the ICC's practice to issue precise, limited certificates of convenience and necessity, listing the exact goods to be carried and the origin and destination of the carriage. A sample application, for example, seeks authority to carry "carpet and carpet padding, uncrated, (1) from El Segundo, Calif., to points in Texas, Georgia, South Carolina, and Florida, and (2) from Sparks, Nev., to points in California, Oregon, and Washington."[5] This type of authority is usually called "new products" authority, since it is generally applied to carriage of newly manufactured goods in transport from the manufacturer to the wholesaler or to the retailers. Since the ICC issues only such product-specific and route-specific certificates, virtually all new business secured by a carrier must be approved by the ICC. A carrier's business will stagnate unless new certificates of convenience and necessity can be obtained to meet the transportation demands of new customers or new shipping demands of old customers. NAVL also holds three certificates for the transportation of household goods. The ICC regulates the interstate transportation of household goods (domestic furnishings transported when a customer changes residence) under a different regulatory scheme. Wholly different regulations apply to this form of carriage, *see* 49 C.F.R. pt. 1056 (1975), and the contents of the certificate authorizing carriage are not similar to the narrowly drawn new products certificates.

The present dispute over the ICC's flagging practice as applied to NAVL's new products applications had its origin in the ICC's decision in 1970 to revise its regulations regarding transport of household goods. 35 Fed.Reg. 4754, now 49 C.F.R. pt. 1056 (1975). These regulations set new, stricter standards of performance for carriers of domestic furnishings. The regulations did not (and still do not) set minimum levels of conformity which, if met, would be deemed to be permissible compliance levels. The ICC's Bureau of Enforcement determined that full 100% compliance was the appropriate conformity standard, such that any shortfall would subject the carrier to discipline. In 1972 the ICC commenced audits of major carriers of household goods, including NAVL. The investigations directed against certain of NAVL's competitors were terminated, however, when those carriers (in particular Aero-Mayflower Transit Co. and Allied Van Lines) agreed to sign a consent order assuring 100% compliance. NAVL was offered the option of signing this order or subjecting itself to formal investigation. It chose the latter course, protesting that 100% compliance was physically impossible.

On September 28, 1972, the ICC commenced the threatened investigation into NAVL's "fitness." North American Van Lines, Inc., Investigation and Revocation of Certificates, No. MC–C–7901 [hereinafter referred to as 7901]. The investigation encompassed various aspects of NAVL's household goods operations, but central to the investigation was the question of acceptable compliance levels under the newly promulgated household goods regulations. Throughout the course of the 7901 proceedings[6] the ICC gave NAVL reason to believe that if it would sign the proffered consent order setting 100% compliance levels, NAVL would be found "fit" and the 7901 proceedings would be terminated.

4. Opinion issued Oct. 31, 1974; corrected for publication Dec. 5, 1974.

5. NAVL application No. MC–107012 (Sub-No. 143) (filed Feb. 7, 1972).

6. Despite the passage of 3½ years and completion of a full audit, these proceedings are still technically open.

At the time the 7901 proceedings were commenced, NAVL had pending before various hearing officers of the ICC some eleven applications for new products authority which had proceeded to the point that the initial fitness determination had been made, and all that was left to do was to issue the certificates. These certificates were withheld, however, for the reason that "matters concerning applicant's fitness are in issue in a pending proceeding in No. MC–C–7901, which makes it inappropriate at this time to determine applicant's fitness to perform the proposed service in conformity with the requirements of the [Interstate Commerce] Act and the Commission's rules and regulations thereunder."[7]

The practice of staying or "flagging" all of NAVL's applications for new operating authority was likewise applied to applications which thereafter were presented for determination to the various hearing officers and boards.[8] It appears that since September 8, 1972, the ICC has failed to grant a single application made by NAVL but has instead stayed consideration of each new products application for the duration of the investigations which have been instituted against NAVL.

There are now three pending investigations before the ICC involving NAVL. The institution of each investigation has been the occasion for sua sponte orders by the ICC reopening each application proceeding and imposing an additional "flag" on each application proceeding. Thus, NAVL now faces three piggy-backed flags which must be lowered before it can hope to have a final decision in any of its pending application proceedings.

The first flag which the ICC has imposed resulted from the initiation of the 7901 investigation proceedings mentioned above. That investigation was announced September 28, 1972; on March 14, 1973 the ICC ordered hearings to be held. On July 9, 1973 hearings were begun before Administrative Law Judge Glennon; the record was closed in October 1973.[9] ALJ Glennon's ruling was issued June 4, 1974.[10] As to the collateral questions presented, the ALJ found for NAVL on certain questions and against it on others. Those charges which the ALJ found to be true related to tariffs, warehouse space allocation among customers, and estimating techniques. The ALJ specifically found that the nature of these violations did not warrant revocation of NAVL's certificates; rather, a cease-and-desist order was deemed sufficient. The ICC does not here contend that NAVL has violated any of the cease-and-desist orders.

The central issue in the 7901 proceedings was resolved in NAVL's favor. ALJ Glen-

7. This ruling is to be found, virtually verbatim, in every ICC order flagging NAVL's applications.

The ICC disposition of the eleven applications then ready for determination is as follows (docket references are to the "Sub-Numbers" under the lead docket for NAVL): Sub-Nos. 133 (Nov. 24, 1972), 152 (Nov. 29, 1972), 135 (Dec. 12, 1972) and 126 (Jan. 15, 1973) were sua sponte reopened by the ICC in order to enter the stays. In Sub-No. 145, the initial findings of fitness were ordered "reconsidered" Feb. 14, 1973, and the proceedings were formally stayed Nov. 21, 1973. Six of the applications were *informally* stayed without further order: Sub-Nos. 137, 139, 140, 142, 146 and 147. This refusal to issue a formal stay in the latter six application proceedings was the subject of NAVL's prior suit in *North American Van Lines v. Interstate Commerce Comm'n,* 386 F.Supp. 665 (N.D.Ind.1974). In that case the court entered a writ of mandamus directing the ICC to take certain action in regards to these applications. The ICC subsequently entered formal stay orders in the six dockets.

8. Thus, after the 7901 investigation was announced, but before hearings were ordered, four applications were stayed: Sub-Nos. 154 (Jan. 9, 1973), 149 (Jan. 16, 1973), 150 (Jan. 16, 1973) and 141 (Jan. 26, 1973). In each instance, and in all application proceedings subsequent to the institution of the 7901 investigation, all findings necessary for issuance of the certificates were made, but the issuance of the certificates was held in abeyance for the sole reason that NAVL's "fitness" was under investigation in the 7901 proceedings.

9. During this period five more applications were stayed: Sub-Nos. 158 (Mar. 16, 1973), 155 (Mar. 21, 1973), 160 (Apr. 25, 1973), 143 (June 18, 1973) and 148 (Sept. 16, 1973).

10. While the case was under advisement, Sub-No. 178 was stayed (Nov. 20, 1973).

non agreed with NAVL that full 100% compliance with the household goods regulations was impracticable, such that violations of the regulations could not be made out merely upon a showing that an isolated shortfall had occurred. In order to determine feasible compliance levels, the ALJ accepted NAVL's offer that a field study be conducted in which NAVL's household goods operations would be audited for the purpose of determining what compliance level could reasonably be demanded.

This decision, undermining the Bureau of Enforcement's efforts to secure voluntary compliance with the 100% compliance level, was handed down June 4, 1974.[11] On June 5, 1974—*the following day*—the ICC announced a new and *unrelated* "investigation" into NAVL's operations, designated MC–C–8372. This "investigation" concerned various new products certificates held by NAVL. As counsel for the ICC admitted at oral argument, however, these proceedings hardly constitute an "investigation." Instead, it appears that it is ICC practice to utilize adversary proceedings for the purpose of defining the meaning of certain carriage classifications under which carriers such as NAVL operate. A carrier with existing authority seeks to transport goods which are arguably within the authorized classification, but for which there is no clear guidance from the ICC's regulations. In lieu of rulemaking, the ICC determines the issue by challenging the carrier in a "declaratory" proceeding. In the case of 8372, for example, one of the "violations" involved was whether NAVL had exceeded its authority by transporting certain lawn mowers. The purpose of the challenge is to determine whether such mowers properly belong to the class "agricultural equipment" or to some other class. Similar "violations" involved in 8372 concerned the carriage of ping-pong tables, pool tables, and crated musical organs. Counsel for ICC admits that the purpose of the 8372 proceedings is to construe the existing regulations, not to seek punishment of NAVL. The relevance of the 8372 proceedings was not made clear, however, until May 13, 1975, when for the first time the ICC indicated that the pendency of these proceedings would constitute grounds for imposing a second flag on all of NAVL's applications.[12]

After the ALJ's order in the 7901 proceedings had been entered, the Bureau of Enforcement petitioned for review by Division 1 of the ICC. The issues were fully briefed, and NAVL continued to offer a settlement based on the field study approved by the ALJ.[13] On August 10, 1974, the Enforcement Bureau announced its opposition to the offer of settlement, without stating reasons. On August 19, 1974, the ICC ordered ALJ Glennon's decision to be stayed indefinitely. No reasons were given. Thus, by August 19, 1974, numerous NAVL applications were being held in abeyance pending termination of the 7901 proceedings, the 7901 proceedings were being held open by ALJ Glennon's order directing a field study to determine feasibility levels, and the commencement of the field study was stayed by the ICC.[14] In each instance, the sole reason for staying consideration of the new products applications was that NAVL's "fitness" was under investigation in the 7901 household goods proceedings, such that it would be "inappropriate" for the ICC to make an independent determination of "fitness" in any of the individual new products application proceedings.

---

11. The propriety of the flagging action based on the 7901 proceedings was also under attack in court. *North American Van Lines v. ICC,* No. F 74–13 (N.D.Ind., filed Jan. 25, 1974).

12. The possibility of using the 8372 proceedings as a second flag was first hinted in the order denying NAVL's second petition for clarification of the ICC order of March 5, 1975 in the 7901 docket.

13. Despite the ALJ's ruling, the ICC continued to stay NAVL's applications: Sub-No. 180, stayed July 10, 1974.

14. Shortly thereafter, two more applications were stayed: Sub-Nos. 189 (Aug. 28, 1974) and 191 (Sept. 4, 1974).

It was at this stage that the decision in *North American Van Lines v. Interstate Commerce Comm'n,* 386 F.Supp. 665 (N.D. Ind.1974) was handed down. At that time some 24 applications were being held in abeyance. The court ruled that while a carrier's "fitness" is clearly an appropriate criterion to be considered in determining new products applications, and while the ICC may consider the record of parallel proceedings in reaching its determination,[15] the Interstate Commerce Act does not delegate to the ICC "the power to institute a rule withholding *all* certificate applications any time and every time there is a carrier investigation pending, regardless of [the] facts concerning the individual [new products] application[s] and the nature of the complaint at issue in the [fitness] investigation." 386 F.Supp. at 676 (emphasis in original). " '[F]itness' in respect to new certificate applications is a case-by-case determination (so long as there is no consolidation of cases)." *Id.* at 677. The court therefore held that NAVL was entitled to a hearing and determination under 5 U.S.C. §§ 556–58 (Administrative Procedure Act) as to whether it was appropriate to stay the new products applications in light of the 7901 proceedings.[16] ICC was mandated either to issue the certificates in question, or to provide NAVL with a meaningful hearing at which facts relevant to the propriety of issuing the stays could be considered *in*

*advance of* the decision to stay proceedings. *See* 386 F.Supp. at 677–78. No appeal was taken from that decision.

NAVL responded to this decision by filing a petition on Nov. 21, 1974 seeking issuance of the six informally stayed applications [17] and by filing petitions for reconsideration of the 18 formally entered stays.[18] The petitions for reconsideration incorporated by reference the ruling in 386 F.Supp. 665, and sought to dissolve the stay in order to have a hearing on the propriety of applying the flagging practice.

On December 20, 1974, the ICC ruled against NAVL's request that the six informally stayed applications be issued, and reopened each application proceeding for a determination as to whether flagging was appropriate. NAVL submitted a lengthy brief setting forth many of the facts the court had found to be relevant to a flagging determination.[19] As for the petitions for reconsideration of the 18 formally stayed applications, the ICC on Jan. 2, 1975 denied the petitions on the grounds that NAVL had not shown in its petitions seeking a *hearing* on the flagging issue that it was entitled on the merits *to have the stays lifted.*[20]

This suit was filed Feb. 26, 1975. At that time the ICC's blanket denial of NAVL's motion for reconsideration of the 18 formally stayed applications [21] presented NAVL

---

15. *See also United States v. Pierce Auto Freight Lines,* 327 U.S. 515, 529–30, 66 S.Ct. 687, 694–695, 90 L.Ed. 821, 831–832 (1946).

16. The order went only to the six applications which had been informally stayed, *see* note 7 *supra.* A ruling as to the other applications would have been premature, since NAVL had not yet exhausted administrative remedies by filing motions for reconsideration before the ICC.

17. Sub-Nos. 137, 139, 140, 142, 146 and 147.

18. Sub-Nos. 126, 133, 135, 136, 141, 143, 148, 149, 150, 152, 154, 155, 158, 160, 178, 180, 189 and 191 (filed Nov. 27, 1974).

19. Jan. 28, 1975.

20. During this period the ICC entered a stay in Sub-No. 192 (Dec. 13, 1974). The language

imposing the stay remained the same as had been used two years earlier, and, despite the decision in the first *North American* case, 386 F.Supp. 665, the stay was entered *without* a hearing on the propriety of flagging, and *without* any of the factual findings suggested by *North American.* From this point on, NAVL automatically filed petitions for reconsideration of each new stay order, based on the refusal of the ICC to offer any hearing on the issue or to support its decision with factual findings. These petitions were routinely denied for the reason that NAVL had shown no right to a hearing since it had failed to show in its petition that it was entitled to the issuance of the certificate. The first such petition was filed Dec. 27, 1974 in Sub-No. 192.

21. *See* note 17 *supra.*

with administratively final determinations formally adopting the flagging practice. At this time, the six applications subject to the mandate in 386 F.Supp. 665 [22] were still under reconsideration by the ICC as to the propriety of employing the flagging rule. New applications during this period continued to be stayed, however, *without* hearing or factual determination as to the propriety of such a stay.[23]

On March 5, 1975, the logjam of stayed applications appeared to break at last, as the ICC lifted its stay in the 7901 docket and approved ALJ Glennon's findings in the household goods investigation. 121 M.C.C. 126. The only modification of the order was that the field audit to determine feasibility levels was to be conducted jointly by NAVL and the ICC, rather than by NAVL alone.

It was NAVL's understanding at this point that the 7901 proceedings, originally cast as a "fitness investigation," had now been transformed into a cooperative fact-finding proceeding, similar to fact-finding in preparation for rule-making, whereby the ICC could set feasible compliance levels for its household goods regulations. Accordingly, NAVL filed on April 9, 1975, a petition for clarification of the March 5 order, asking that the status of the numerous stayed new products applications be clarified. On April 19, however, the ICC responded thusly: "[NAVL's] pending application proceedings are being held open for further consideration of [NAVL's] fitness after final determination of [7901]; that in its present posture, [7901] is not administratively final; and that, accordingly, it is inappropriate at this time to determine [NAVL's] fitness." On May 1, 1975, NAVL filed a second petition for clarification, asking exactly what it could do to have its new products applications considered, and suggesting the possibility of limited-term certificates during the administrative pendency of 7901. This second petition was denied on May 13, 1975, the ICC ruling that so long as the fitness of a carrier was under investigation, no new certificates of convenience and necessity could be issued. The ICC also noted that more than 7901 was involved, since the declaratory 8372 proceedings [24] were likewise pending, and there had been an adverse determination in one of NAVL's new products applications.[25] Without any prior indication that the issue was to be addressed in its response to NAVL's petition for clarification, the ICC sua sponte ruled that all of NAVL's application proceedings were now subject to a second flag on account of the pendency of the 8372 proceedings.[26] On June 2, 1975, the ICC sua sponte reopened the six application proceedings which had been informally stayed [27] and imposed the second (8372) stay on them. No prior notice or opportunity for hearing was given, and the order imposing the stay contained no findings of fact as to the need for or propriety of issuing the second stay.[28] An order

22. *See* note 16 *supra.*

23. Sub-Nos. 182 (Jan. 16, 1975) and 198 (Jan. 24, 1975); petition for reconsideration in Sub-No. 198 filed Jan. 24, 1975. Subsequent to the filing of the original complaint in this case, other applications were stayed. Applications embraced by NAVL's supplemental complaint stayed during this time include Sub-Nos. 179 (Feb. 24, 1975), petition for reconsideration filed Mar. 7, 1975; petition for reconsideration in Sub-No. 163 filed Feb. 24, 1975.

24. *See* text at notes 10–11 *supra.*

25. Sub-No. 170 (May 2, 1975). In Sub-No. 170, a new products application had been denied on the merits because of certain past violations of the new products regulations by NAVL. The

nature of these violations has not been brought to the court's attention. It is significant to note that in this one application proceeding, the ICC flagging practice was not applied. No reasons have been given for the exceptional treatment of the Sub-No. 170 application.

26. At this point, the Sub-No. 170 proceedings were closed and, hence, could not be used as the basis of staying applications on account of "pending" proceedings.

27. *See* note 16 *supra.*

28. Such findings of fact were made in the ICC's May 2, 1975 order in the Sub-No. 170 docket, where the ICC found that the nature of the Sub-No. 170 violations did not require reopening of the 7901 proceedings.

formally imposing the second stay on the 18 orders previously stayed [29] was entered June 17, 1975.

NAVL's response to these developments was to file on May 21, 1975 a plenary petition under Rule 102 (49 C.F.R. § 1100.102 (1975)) under the 7901 docket, but embracing all pending application proceedings, the 8372 proceedings, and the Sub-No. 170 proceedings. In this petition, NAVL gave assurances of compliance with reasonable performance criteria under the household goods regulations and invited an audit of NAVL's operations in order to demonstrate good faith and effective compliance with those regulations. NAVL also suggested that should the audit show interim compliance, the ICC should lift the stays of its applications and issue either regular or limited-term certificates. The requested audit was in fact conducted by the ICC during July and August, 1975.[30]

At this point, then, NAVL could expect that its Rule 102 petition, with the attendant audit, might close the 7901 proceedings, or at least serve to demonstrate "fitness" under 49 U.S.C.A. § 307, and that the 8372 proceedings, in which the record had been closed April 15, 1975, might reach conclusion shortly.

This did not happen. Instead, on September 23, 1975, the ICC entered an order in the 7901 docket, apparently in response to the Rule 102 petition, "recalling" all outstanding applications[31] and reopening the Sub-No. 170 proceedings. The ruling did not expressly deal with the 8372 proceedings. The ICC reiterated its position that when any investigation proceeding is pending, the applicant's "fitness" is in issue, and that "fitness" is a criterion in any application proceeding. Since it is more efficient to determine fitness in a single proceeding, and since a carrier's fitness as revealed in all pending proceedings is relevant to each proceeding, the fitness investigation should first proceed to termination before individual applications may be acted upon. The ICC then determined that the Sub-No. 170 proceedings should be reopened since serious questions as to NAVL's fitness had been raised there, and that *every pending application* should be made subject to a *third* stay. The Commission indicated, however, that a determination in Sub-No. 170 might well settle the fitness question presented in all investigation proceedings.[32] No mention was made of the results of the recently completed audit of NAVL's operations. Also, no notice had been given that the ICC intended to use the Rule 102 petition as a vehicle for imposing a stay based on the sua sponte reopening of the Sub-No. 170 proceedings.

NAVL petitioned for reconsideration of this order, arguing that the imposition of the stay had been made without notice or hearing, that the decision was substantively wrong in that it failed to take into account the ICC's own audit of NAVL's operations, and that in any event it was inappropriate to stay the applications simply because a fitness investigation was pending. NAVL also requested limited term certificates as an alternative remedy, and suggested that the ICC accept a settlement offer. By this offer, NAVL would agree to sign a cease-and-desist order in the household goods matter, whereby NAVL would agree to maintain 90% compliance. The 90% figure was drawn from a litigation settlement between the ICC and Global Van Lines, whereby Global agreed to a 90% compliance level.

29. *See* note 17 *supra.*

30. Further stays entered during this period: Sub-Nos. 196 (June 6, 1975), 197 (June 9, 1975). Petitions for reconsideration denied in Sub-Nos. 182 (June 9, 1975), 192 (June 9, 1975), 198 (June 9, 1975), 163 (June 9, 1975), 179 (June 9, 1975); petitions for reconsideration filed in Sub-Nos. 199 (July 9, 1975), 196 (July 11, 1975), and 197 (July 11, 1975).

31. Sub-Nos. 126, 133, 135, 141, 143, 145, 148, 149, 150, 152, 154, 155, 158, 160, 178, 180, 189, 191, 198, 163, 179, 182, 137, 139, 140, 142, 146, and 147.

32. When Sub-No. 170 had been originally decided, however, the ICC had expressly found that the type of violation found in 170 was unrelated to the type of violation presented in 7901.

By an order dated December 22, 1975, the ICC denied NAVL's petition. It reaffirmed its prior holding that so long as "fitness" is involved in any pending proceedings, no new products applications may be processed. The ICC also rule that as to "notice," since NAVL by then must have known that the ICC was likely sua sponte to impose stays, it had actual notice of the practice. As for NAVL's opportunity for a hearing, the ICC explained that it had ample opportunity in the case now before this court to take advantage of a hearing on the merits. Finally, and again without warning, the ICC sua sponte decided to rescind its earlier decision in the 7901 docket agreeing to the joint field study of compliance levels in household goods operations. The results of the field audit undertaken in July and August 1975 were not mentioned.[33] Finally, the ICC found it not to be "appropriate" to extend the terms of the "Global Settlement" to NAVL. Instead, 7901 was reopened and consolidated with Sub-No. 170. Further hearings in Sub-No. 170 were ordered on the question of fitness. No mention was made of the 8372 proceedings.[34]

It is NAVL's contention that on these facts, the ICC has "unlawfully withheld or unreasonably delayed" consideration of its various new products applications, within the meaning of 5 U.S.C. § 706(1).

### The ICC's "Flagging" Policy

The Interstate Commerce Commission is required by 49 U.S.C. § 307 to make certain determinations before a carrier's application for a certificate of convenience and necessity may be approved. First, the applicant must be found "fit, willing, and able properly to perform the service proposed." Next, the carrier must be found to be "fit, willing, and able . . . to conform to the provisions of [the Interstate Commerce Act] and the requirements, rules, and regulations of the Commission thereunder." Fi-

nally, the proposed service must be found to be warranted by the public convenience and necessity. These three requirements, the first two of which require scrutiny of the applying carrier's fitness, are explicit statutory criteria. 49 U.S.C. § 307. The ICC agrees, and considers each criterion separately. See Commission's Order in 7901 (entered September 23, 1975).

In each application proceeding here on review, the ICC made favorable findings of operational fitness (ability to perform the proposed service) and of public convenience and necessity (need for the proposed service). It is the ICC's contention, however, that NAVL's fitness, willingness, and ability "to conform to the provisions of [the Interstate Commerce Act] and the requirements, rules, and regulations of the Commission thereunder" cannot be sufficiently made out in any particular application proceeding so long as a general fitness investigation involving NAVL is elsewhere pending.

■ This rule has never been promulgated under formal rulemaking procedures, 5 U.S.C. § 553 or published pursuant to 5 U.S.C. § 552; hence, the first task is to determine exactly what the ICC's flagging rule is. There is, of course, no requirement that an agency formulate its substantive rules by the rulemaking process; a case-by-case or adjudicative approach is permissible. *Securities & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947).

The most extensive explanation of the flagging rule appears in the ICC's order of September 23, 1975, in the 7901 docket:

"[T]he issue of a carrier's fitness involves two separate considerations, (1) the applicant's fitness, willingness and ability to perform a particular operation (operational fitness), and (2) its fitness, willingness, and ability to conform to the Act and the Commission's rules and regulations thereunder. . . . [W]hile the

---

**33.** NAVL estimates that the results of the audit would show in excess of 95% compliance.

**34.** The ICC also rejected all objections by the Bureau of Enforcement to the ALJ's decision in 7901.

issue in (1) may involve matters related only to a specific proceeding, those in (2) constitute a general issue which can be resolved by consideration of its status as revealed through the records in all its pending proceedings. . . . [I]n the instance where this second overriding aspect of a carrier's fitness has been raised as an issue in a particular case . . . the question of a carrier's fitness, willingness, and ability to conform its operations to lawful requirements is a matter that relates to all its pending proceedings and this issue, by statute, must be resolved before any certificate may be issued. . . . [I]t is a long-established Commission policy . . . to withhold issuance of new authority . . . to any applicant while such carrier's fitness is under investigation in a formal proceeding. . . ."

It is thus the ICC's practice, whenever a formal investigation involving a carrier's fitness is commenced, to quickly disseminate that fact to the various boards and hearing officers considering new operating applications, and for those boards and officers to withhold final certification until the fitness question is resolved. The flagging policy thus contemplates a certain benign delay, contrary to the ICC's usual policy favoring speedy processing of applications, cf. 49 C.F.R. §§ 1100.45–1100.54 (1975), but serving arguably plausible goals of administrative efficiency.

In evaluating the application of this policy to NAVL's applications, two precepts must be kept in mind. First, as a general matter, 5 U.S.C. § 558(c) requires: "When application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons *and within a reasonable time,* shall set and complete proceedings . . . ." (emphasis added). The requirement of timely processing of license applications is complemented by the relief provisions of 5 U.S.C. § 706(1) ("compel agency action unlawfully withheld or unreasonably delayed"). Thus, a deliberate policy of institutionalized delay must be closely scrutinized, and the purported justifications tested against the actual practice employed.

Secondly, there is great potential for abuse where a criterion for receiving a public license is an applicant's willingness to obey the agency's directives. A company may indeed be unwilling to conform to an unreasonable regulation, and may refuse to consent to the agency's insistence of compliance, in order to create a genuine controversy ripe for judicial review under the Administrative Procedure Act. It would be unseemly to punish as "unfit" a company whose only misstep was its temerity in seeking judicial review of agency decision-making. Likewise, where the agency utilizes investigation proceedings in lieu of the rulemaking process as a means of construing existing regulations, it would seem unjustified to characterize the company's participation in such declaratory proceedings as evidence of "unfitness."

### The Court's Jurisdiction

Title 28 U.S.C. § 1336 provides that district courts have jurisdiction of actions "to enforce, enjoin, set aside, annul or suspend . . . any order" of the ICC. Section 1336 jurisdiction is usually governed by the provisions of 28 U.S.C. §§ 2321–25. *North American Van Lines v. ICC,* 386 F.Supp. 665, 680 (N.D.Ind.1974). Since plaintiff seeks in part an injunction "restraining the enforcement, operation or execution . . . of any order," 28 U.S.C. § 2325, jurisdiction rests with a three-judge court.

Section 1336 applies to review of "final" orders of the ICC. Technical finality under 49 U.S.C. § 17(9) requires that plaintiff have first petitioned the ICC for rehearing or reconsideration of the order sought to be reviewed. In this case, each stay order has been reconsidered by the ICC under the procedures provided by 49 C.F.R. § 1100.101 (1975). Likewise, the propriety of the stay orders has repeatedly been reheard by the ICC on NAVL's numerous petitions for clarification in the 7901 docket, on NAVL's Rule 102 Petition in the 7901

docket, and on the formal petitions for reconsideration of orders in the 7901 docket refusing to lift the stays entered in the various individual application proceedings. The imposition of the stays is not only final in the technical sense, but in a practical sense as well. NAVL has sought relief from the stays in every manner allowed by the Commission: formal petitions for reconsideration filed in each application proceeding, formal petitions for reconsideration and clarification filed in the investigation proceeding, and plenary petitions filed under Rule 102 to consider the precise question presented in this suit. Although a stay order is not a final adjudication of the merits, but rather is in the form of an interlocutory order, the "finality" requirement of 28 U.S.C. § 1336 is met, and the order is reviewable, if the order is "final" in its general sense—"sufficiently final to be appropriate for judicial review." *North American Van Lines v. ICC, supra,* 386 F.Supp. at 681, and cases there cited. And since 5 U.S.C. § 706(1) provides a remedy for administrative action unlawfully withheld or unreasonably delayed, the withholding of certificates and the purposeful delay in processing applications must at some point be judicially reviewable if Section 706(1) is to have effect. That point is reached, as here, where the decision to delay or withhold action has become concrete, and where the agency's firm commitment to the decision is evidenced by affirmative actions on its part.

■ Nor is the ICC's practice of deferring decision in application proceedings a matter "committed to agency discretion by law," 5 U.S.C. § 701(a), and thus exempt from judicial review. Commitment by law of an issue to discretionary agency determination "is a very narrow exception. . . . The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136, 150 (1971), *quoting* S.Rep.

No.752, 79th Cong., 1st Sess. 26 (1945); *Secretary of Labor v. Farino,* 490 F.2d 885, 888–89 (7th Cir. 1973). Title 49 U.S.C. § 307(a) directs that a certificate "shall be issued" if the applicant is found fit; "otherwise such application shall be denied." The statute does not, by its terms, commit to agency discretion the decision of whether it will act upon the application or not; rather, the ICC is charged with the duty of granting or denying the applications, and in applying reviewable statutory criteria of fitness in rendering its decision.

■ Of course, the ICC may well determine that application proceedings should, in individual cases, be stayed because of the pendency of a fitness investigation involving the carrier. A carrier's fitness may be placed in such doubt by virtue of findings made in an investigation that the public interest would be best served by withholding new operating authority until creditable assurances have been made that all violations have been remedied, and the carrier's fitness rehabilitated. The cross-relation of such a fitness investigation to the individual new authority applications involves complex questions of fact and law. The ICC's superior expertise and experience in evaluating such cross-relevance deserves proper judicial deference. In this sense, the ICC has considerable discretion in determining whether and when to stay pending application proceedings. But judicial deference is not complete in this area, and agency discretion is not unfettered. Unlike a matter truly committed to agency discretion by law, an arbitrary refusal by the ICC to consider an application is reviewable. The distinction to be made is that where the governing statute *commits* the matter to agency discretion, there can be no judicial review; but where the nature of the matter requires administrative expertise, agency discretion, while broad, is bounded by the rules of review set forth in 5 U.S.C. § 706. In the latter case, agency discretion is not complete, but exists by virtue of a form of statutory "commitment" which presupposes judicial review that is subject to standards of judicial deference as codified in Section

706. Since we do not find that the ICC by statute is clothed with the discretion whether or not to process applications, we find that its delays in processing NAVL's applications are reviewable under the Administrative Procedure Act. *See generally North American Van Lines v. ICC, supra,* 386 F.Supp. at 675–77.

### Scope of Review

Under 5 U.S.C. § 706(1) the reviewing court may "compel agency action unlawfully withheld or unreasonably delayed." The "agency action" involved in this suit which has been withheld or delayed is the final determination of NAVL's applications.[35] "Unlawful," as the term is used in Section 706(1), includes but is not limited to the meaning given in Section 706(2): "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . (D) without observance of procedure required by law." If some or all of the applications have been unlawfully subjected to flagging, then the delay suffered by NAVL would be unreasonable as well. But in addition, even if some or all of the stays cannot be deemed to be unlawful, the question remains whether NAVL is entitled to relief under Section 706(1) requiring the court to direct the ICC to conclude the application proceedings with dispatch and, by implication, to take other steps which are prerequisite thereto. *Cf. NLRB v. J. H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 266 & n. 3, 90 S.Ct. 417, 421, 24 L.Ed.2d 405, 412 (1969).

Although this suit is in the form of a review of ICC actions on 18 separate applications (under the original complaint) and additional applications (under the supplemental complaint), identical questions as to

the lawfulness of the flagging policy in itself are raised in each application proceeding.[36] NAVL charges that the ICC has no authority to establish a flagging rule, that even if the ICC has the power to declare such a rule, the ICC has failed to properly promulgate the rule as required by the Administrative Procedure Act, and that even if properly promulgated, the rule has been unlawfully applied to NAVL's application proceedings.

### The Flagging Practice as a Rule Under 5 U.S.C. § 553

It is NAVL's contention that the flagging practice may not properly be applied to the new products applications since the flagging rule has never been promulgated under the provisions of 5 U.S.C. § 553. In fact the flagging rule has never been the subject of advance notice, followed by responses from interested persons and by publication described in that section. Whether or not the flagging rule is the type of substantive regulation governed by Section 553, it is settled that an agency may choose to announce such a rule in the course of adjudication rather than by formal rulemaking. *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947). In that case, the Court reasoned that in the course of an adjudication, an agency might face a new problem not covered in existing regulations, or "the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule,"[37] or where the problem is "so specialized and varying in nature" that a simple rule would be inadequate. The nature of the flagging rule is not among these categories. Yet the ICC relies on Chenery's rule that the decision whether to

---

**35.** This is not a suit to compel issuance of the stayed certificates; rather, it is a suit to compel the ICC to grant *or deny* the applications involved.

**36.** Although NAVL's various applications cover diverse goods, different manufacturers, and different routes of travel, and although some of NAVL's applications were opposed, such distinctions played no role in any of the orders

imposing the stays. *See* note 7 *supra* and text accompanying.

**37.** This, of course, is precisely the problem in the household goods investigation (7901). The proposed cooperative investigation approved by the Administrative Law Judge should be understood as an adjudicatory proceeding in lieu of rulemaking.

proceed with rulemaking or adjudication is primarily a matter of agency discretion. *Id.* at 203, 67 S.Ct. at 1580, 91 L.Ed. at 2002.

The *Chenery* rule has been much criticized, *see, e. g.,* C. J. Peck, *A Critique of the National Labor Relations Board's Performance in Policy Formulation: Adjudication and Rule-Making,* 117 U.Pa.L.Rev. 254 (1968); Bernstein, *The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act,* 79 Yale L.J. 571 (1970). The Supreme Court has not yet overruled *Chenery,* however; consequently, we cannot say that it was unlawful per se for the ICC to adopt its flagging practice by announcement in an adjudicatory proceeding.

We must note, however, that many of the concerns voiced by the plurality in *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), are applicable here. One of the dangers with adjudicatory rulemaking is that the litigant will be prejudiced by the application of a rule of which it had no advance warning. *See Chenery, supra* at 203, 67 S.Ct. at 1580, 91 L.Ed. at 2002. This danger is lessened where the agency abides by the requirements of 5 U.S.C. § 554(b) by timely notifying the applicant for a license of "the matters of fact and law asserted" as relevant to the determination of the license application. *See Wyman-Gordon, supra,* 394 U.S. at 771 n. 3, 89 S.Ct. at 1432, 22 L.Ed.2d at 718. (Black, J., concurring in the result).[38]

### The Flagging Practice as a Rule Under 5 U.S.C. § 552

"Rules of agency organization, procedure, or practice" are exempted from the notice and hearing requirements of Section 553. 5 U.S.C. § 553(b). Rules of procedure must, however, be first published in the Federal Register, and "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter . . . not so published." 5 U.S.C. § 552(a)(1). The Flagging rule has never appeared in the Federal Register.

The ICC urges that NAVL has had actual knowledge of the flagging rule at all times relevant hereto. Actual knowledge of the rule is sufficient if the rule is properly a Section 552 rule. *Kessler v. FCC,* 117 U.S. App.D.C. 130, 326 F.2d 673, 689 (1963). In *Kessler,* the FCC ordered a freeze on all new filings for licenses, in that the agency had determined that existing regulations were inadequate. The *Kessler* freeze was properly published in the Federal Register, *see* 326 F.2d at 682; and applicants who filed during the time between entry of the freeze order and its publication were found to have had actual knowledge of the contents of the order. *Id.* at 689.

The *Kessler* rule finds only limited application here, however, in that the *Kessler* court had before it the concrete expression of the rule as published in the Federal Register; here, we have various explanations of the flagging practice as articulated by the ICC in its orders, explanations which are not completely consistent with one another. The ICC has not submitted any document or publication, other than the orders here under review, which sets forth the scope and requirements of the flagging practice. We therefore find that NAVL's knowledge of the rule, if any, is no greater than this court's.[39]

### Validity of the Flagging Rule

Supposing that a disreputable carrier committed such serious violations of the Interstate Commerce Act and the ICC's

---

**38.** It must be noted that the flagging rule was fully explained for the first time in this litigation some three years after the first of NAVL's applications had been stayed.

**39.** It would be improper to say that a carrier is bound by any rule of which it has knowledge. Rather, a carrier is not bound by a rule of which it has no knowledge, and it is bound by a rule actually or constructively known only insofar as the rule is not substantively impermissible under either the APA or under the organic Act of Congress which defines the agency's powers and purposes.

regulations thereunder that the carrier's very willingness to conform its behavior to lawful requirements was placed in issue: would the ICC be required to routinely process the carrier's applications for new operating authority during the pendency of a formal fitness or revocation proceeding? Plainly not. *North American Van Lines v. ICC, supra,* 386 F.Supp. at 676. A rule *allowing* withholding of decision, in *appropriate* cases, surrounded with procedural safeguards required by the Administrative Procedure Act, would be fully in harmony with the purposes of the Interstate Commerce Act.

The ICC urges that the flagging rule is a discretionary rule, applied only after a consideration of the cross-relation between the individual application proceeding and the outstanding fitness investigation. Indeed, in its most recent order in the 7901 docket (Dec. 22, 1975), the ICC contended that "the Commission considers whether an application proceeding should be held open pending fitness [determination] at the time it considers the evidence in the particular case."

The record is barren of any support for this contention. In each order staying decision of NAVL's applications, the *only* "findings" related to the flagging rule are as follows: "*It appearing,* That matters concerning the fitness of applicant are in issue in a pending proceeding in No. MC–C–7901, which makes it inappropriate here to determine applicant's fitness properly to perform the proposed service in conformity with the requirements of the Interstate Commerce Act and the Commission's rules and regulations thereunder." [40] Despite the repeated requests of this court at pre-trial conference that the ICC locate and submit that part of the record in any of the application proceedings in which the hearing officer or review board heard evidence as to the cross-relevance of the 7901 proceedings to the application proceeding under consideration, no such record has been forthcoming.

The inference that the ICC's flagging rule is in fact an *automatic* rule is further supported by the ICC's own explanation of the rule: "[I]t is established Commission policy to withhold issuance of new authority to any applicant while said carrier's fitness is under investigation in a formal proceeding; that, in such instances, it is not determinative that the application is unopposed or that the applicant has been previously found fit; and that once an investigation proceeding is instituted, all new authorities that have not been issued are withheld pending the final determination of the investigation proceeding." Order of June 17, 1975, denying reconsideration of the stays imposed in 18 application proceedings.[41] It will be noted that by this order the flagging rule is made applicable to any "investigation proceeding," not merely a fitness investigation. It was in this order that the ICC first indicated that the pending "investigation" in 8372 (declaratory proceedings as to the classification of lawn mowers, etc.) was reason to impose a second flag.

The ICC order denying clarification of the ICC's order of March 5, 1975 (in which the ICC approved ALJ Glennon's decision) also supports the inference that the flagging rule is applied automatically, if not blindly. After the ICC had approved the ALJ's decision, the 7901 proceedings were in this posture: the Bureau of Enforce-

---

40. This constitutes the entire factual finding upon which NAVL's applications have been stayed. This "finding" appears *verbatim* (except that "here" sometimes becomes "at this time") in the orders in Sub-Nos. 152 (Nov. 19, 1972), 154 (Jan. 9, 1973), 126 (Jan. 15, 1973), 149 (Jan. 16, 1973), 150 (Jan. 23, 1973), 141 (Jan. 26, 1973), 155 (Mar. 21, 1973), 158 (Mar. 16, 1973), 160 (Apr. 25, 1973), 178 (Nov. 20, 1973), 180 (July 10, 1974), 189 (Aug. 28, 1974), 191 (Sept. 4, 1974), 192 (Dec. 13, 1974), 182 (Jan. 16, 1975), and 198 (Jan. 24, 1975). To the same effect, but stated more briefly, are the orders in Sub-Nos. 135 (Dec. 12, 1972), 133 (Nov. 24, 1972), and 145 (Nov. 21, 1973) (119 M.C.C. 179, 285). No explanation at all is given in either Sub-No. 143 (June 18, 1973) or 148 (Sept. 6, 1973). Since the ICC's order of Sept. 23, 1975, the "findings" supporting the stays have quoted the language of that order instead of the version set forth above.

41. Stipulation Ex. 1A.

ment's position that 100% compliance was required had been finally rejected; NAVL's proposition had been accepted that the regulations contemplated a conformity level set at feasibility levels of compliance; and NAVL's offer to participate voluntarily in an audit of its operations to determine such a level had been accepted. All other charges against NAVL had either been resolved by cease-and-desist orders or had been dismissed. Only the fact that the 7901 proceedings remained technically open stood in the way of final determination of NAVL's new products applications. Yet in its order of April 18, 1975, the ICC noted tersely that "the [7901] proceeding is not administratively final; and that, accordingly, it is inappropriate at this time [etc.] . . . ."

We conclude that the stays imposed on NAVL's application proceedings by virtue of the pendency of the 7901 and 8372 proceedings were issued solely on the basis of an automatic rule requiring the withholding of action whenever an investigation involving the carrier was technically unresolved.[42]

In *North American Van Lines v. ICC, supra,* 386 F.Supp. at 676–77 & n.2, it was determined that the Interstate Commerce Act did not delegate to the Commission the power to declare by a rule that *all* certificate proceedings are stayed whenever an investigation proceeding involving the carrier was instituted. At that time the ICC fully agreed with this proposition, admitting that "the Commission must apply its expertise in determining whether the issues

involved in the formal investigation are sufficiently serious to require the Commission not to make any more fitness findings in the carrier's application proceedings until the issues under investigation have been resolved." *Id.* at 677 n. 2. The court ruled that " 'fitness' in respect to new certificate applications is a case-by-case determination (so long as there is no consolidation of cases), and must ultimately be litigated in each application proceeding." *Id.* at 677. Within the limits of its discretion, it may find that the fitness investigation is indeed relevant to the determination of pending applications; it may determine that the potential harm discernible from the yet unproven charges in the fitness investigation outweigh the public's need for immediate service; it may weigh the possible delay to the public against the possible harm to the public if the application is not stayed; but it must *exercise* its expertise, it must *exercise* its discretion. It is true that the Commission may validly adopt rules which define in advance particular elements of fitness of carrier applicants or, as is affirmed by the court in the prior case, state relevant circumstances in which certificate application proceedings will be stayed pending the outcome of investigation proceedings. It may not, however, substitute a blind rule staying each and every application so long as any investigation whatever, involving the same carrier, is pending. *Id.* at 676–77.

The decision in *North American Van Lines v. ICC* was not appealed.

---

**42.** Conspicuous by its absence from *any* order entered in the 7901 docket, the 8372 docket, or in any of the application proceedings is the mention of the nature of the supposed violations which place NAVL's general "fitness" in issue, or its supposed relation to the "fitness" in issue in an application proceeding. Contrast, in this regard, the ICC's handling of the Sub-No. 170 proceeding. In its June 17 order denying reconsideration of 18 stays, the ICC mentioned the possible relevance of the just-completed Sub-No. 170 proceedings, in which a new products application was denied because of certain violations committed by NAVL. The June 17 order summarized the nature of the violations found, such that their relevance to other application proceedings could at least be

surmised. Further, in that order the ICC analyzed the nature of supposed violations in issue in the 7901 proceeding and determined that the Sub-No. 170 violations were unrelated in nature to the issues in 7901, such that the 7901 proceedings did not have to be reopened to consider the impact of the Sub-No. 170 violations. This determination was made sua sponte, without prior notice that the Sub-No. 170 proceedings would be relevant, and without giving NAVL a prior opportunity to present evidence or arguments on point. The attempt at factual justification of the stay based on the Sub-No. 170 proceedings stands in stark contrast to the lack of any factual basis for the imposition of prior stays.

Although there have been few cases dealing with an agency's attempt to withhold adjudicatory action by application of a self-imposed rule, that rests on other proceedings, the cases reviewing the National Labor Relations Board's "blocking charge rule" are analogous. Under 29 U.S.C. § 159(c)(1), the NLRB is charged with the responsibility of processing petitions for decertification of a bargaining representative. The NLRB is required to conduct a hearing as to whether a question of the union's majority status exists, and if such status is in fact questionable, the NLRB shall conduct a new election. However, the NLRB has formulated a "blocking charge rule," see Annot., 18 A.L.R.Fed. 420 (1974), by which it refuses to proceed with the determination of majority status if an unfair labor practice based on 29 U.S.C. §§ 158(a)(2), (a)(5), or (b)(3) has been filed. Further consideration of the decertification petition is stayed until the merits of the unfair labor practice charge have been determined. The rationale underlying this practice is that unfair practices may have improperly poisoned the employees' minds against the union, such that it would not be proper to hold a decertification election until the effects of the unfair practices had become attenuated.

To compare the NLRB and ICC practices: the NLRB (ICC) has a statutory duty to process and act upon decertification petitions (applications). While such petition (application) is pending, a union (the Bureau of Enforcement) files an unfair practice charge (charge of unfitness) which is immediately set for investigation. The charges contained in the unfair practice charge (unfitness complaint) *may* be relevant to the decertification (application) proceedings, such that it *might* be inappropri-

ate to proceed in haste in the decertification (application) proceedings. The NLRB (ICC) policy is to stay the decertification (application) proceedings until the unfair practice (fitness) investigation is concluded.

In *Templeton v. Dixie Color Printing Co.*, 313 F.Supp. 105 (N.D.Ala.1970), aff'd, 444 F.2d 1064 (5th Cir. 1971), the court ordered the NLRB to proceed with its consideration of the decertification petition notwithstanding the pendency of an unfair practice charge. "The union cannot avoid the consequence of the loss of its majority status by the mere filing of unfair labor practice charges against the employer. Nor does the filing of such unproved charges relieve the Board of its statutory duty to consider and act on a petition for decertification." 444 F.2d 1069 (per Clark, Associate Justice). The *Templeton* rule was further explained in *Surratt v. NLRB*, 463 F.2d 378, 381 (5th Cir. 1972): "[T]he Board should not be allowed to apply its 'blocking charge practice' as a *per se* rule without exercising its discretion to make a careful determination in each individual case whether the violation alleged is such that consideration of the election petition ought to be delayed or dismissed. We are of the view that the record before us clearly demonstrates a failure to give that careful consideration to the petition of the employees for the decertification election."[43] *See also NLRB v. Gebhardt-Vogel Tanning Co.*, 389 F.2d 71, 75 (7th Cir. 1968); *NLRB v. Minute Maid Corp.*, 293 F.2d 705, 710 (5th Cir. 1960).

In this case, the ICC stays *all* of a carrier's pending license application proceedings upon the filing of an investigation by the Bureau of Enforcement against the carrier. The stays are imposed immediately upon the filing of the investigation, whether or not the investigation is truly a fitness inves-

**43.** The Templeton-Surratt situation is colored by the fact that NLRB orders in representation disputes are not generally reviewable at all, *American Fed'n of Labor v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), whereas ICC application decisions are generally reviewable. Where the NLRB attempts to support its blocking charge practice in a particular case with findings of cross-relevance, court review

is precluded because of the rule against reviewability per se, *Bishop v. NLRB*, 502 F.2d 1024 (5th Cir. 1974); *NLRB v. Big Three Indus., Inc.*, 497 F.2d 43 (5th Cir. 1974). The sufficiency of the NLRB's findings of cross-relevance are therefore not reviewable under the standards set forth in 5 U.S.C. § 706. This restriction does not apply to review of ICC determinations in license application proceedings, of course.

tigation,[44] and are not lifted until the investigation has been fully terminated or dismissed. The stays are automatically imposed whether or not the charges in the investigation are proved,[45] unproved,[46] or disproved.[47]. The decision to impose the stay is made ex parte, *without* the formal taking or recording of evidence relevant to the decision, and *without* furnishing factual findings upon which a reviewing court could determine that the ICC had in fact exercised its discretion within permissible limits.

We conclude that the ICC's statutory duty under the Interstate Commerce Act to determine a carrier's fitness in an application proceeding may not be fulfilled by the expedient of promulgating an informal rule automatically withholding a fitness determination whenever an investigation involving the carrier is filed by the ICC's Bureau of Enforcement. We conclude that such a rule is arbitrary within the meaning of 5 U.S.C. § 706(2)(A), that it is in excess of statutory authority under 49 U.S.C. § 307 within the meaning of 5 U.S.C. § 706(2)(C), that it therefore is unlawful within the meaning of 5 U.S.C. § 706(1). The delay attendant upon the application of the rule is not reasonable, within the meaning of 5 U.S.C. § 558(c) and 5 U.S.C. § 706(1).

### Individual Applications of the Rule

NAVL requests that we now look to the individual applications of the rule and determine that the imposition of the stays was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). NAVL urges, and the record fairly supports the finding, that in each application proceeding all determinations necessary for a grant or denial

of the individual license had been made of record, but the final issuance had been withheld because of the automatic imposition of the improper stays. Our option at this point is either to remand each application to the ICC in order to allow it to exercise its discretion by developing a factual underpinning for its stay decision, or to review at this point the propriety of the stays themselves.

Since the decision to stay an individual proceeding involves the interpretation of 49 U.S.C. § 307, we believe a limited form of review as to the propriety of each stay is warranted. The statutory fitness criterion in issue here is a carrier's fitness, willingness, and ability "to conform to the provisions of [the Interstate Commerce Act] and the requirements, rules, and regulations of the Commission thereunder." 49 U.S.C. § 307(a). In imposing the stay in a particular case, the ICC implicitly determines that the existing record in the relevant fitness investigation could in some manner relate to the carrier's willingness to abide by legal requirements. This court has now had the benefit of extensive examinations of the record, briefing and argument as to the nature of the 7901 proceedings, and has the benefit of the ICC's own rulings in that docket. Were the nature of those proceedings unclear, or the status of the charges ambiguous, we would hesitate to determine whether such charges might support a finding of unfitness. But the actions of the ALJ and the ICC itself, ruling on every charge lodged against NAVL, present a firm record from which this court can determine whether the ICC's stay orders were arbitrarily maintained in view of developments in the 7901 docket. Likewise, the nature of the 8372 proceedings, as revealed

---

**44.** Thus the 8372 proceedings, declaratory rather than punitive in nature, were used as the basis for the second flag in each of NAVL's application proceedings.

**45.** Sub-No. 170. Even if NAVL's past conduct is found illegal, it is not prohibited from receiving new operating authority. *See North American Van Lines v. ICC, supra,* 386 F.Supp. at 677 and cases there cited.

**46.** The 8372 proceedings, in which no decision has yet been made.

**47.** The 7901 proceedings, in which the 100% compliance requirement upon which the violations supposedly rested was found to be unreasonable by both the ALJ and the ICC.

in the papers submitted to this court is unambiguous as counsel for the Commission agreed at oral argument.

The 7901 proceedings involved a central charge that NAVL had violated the household goods regulations by failing to meet 100% compliance levels, and certain unrelated charges dealing with household goods. The unrelated charges were dismissed in part, and those found to be true were remedied by a cease-and-desist order. ALJ Glennon specifically found that the gravity of those charges was not sufficient to warrant revocation of certificates. As to the central charge, the administrative law judge rejected the Bureau of Enforcement's contention that a violation of the household goods regulations could be made out upon a showing that the carrier had failed to meet the 100% compliance level insisted upon by the ICC.

The ICC affirmed the ALJ's decision in every respect, modifying the relief only in that the proposed field study would be conducted jointly by NAVL and the ICC. The field study was to be a cooperative venture whereby the ICC could formulate a rule as to acceptable compliance levels by studying NAVL's household goods operations. The ICC decision was entered in this case on March 5, 1975.

None of the stay orders entered on account of the 7901 proceedings relied upon the adverse findings in some of the unrelated charges. Each stay was entered because the decision as to the main charge was not yet administratively final.

The 8372 proceedings, by admission of counsel for the ICC, are declaratory proceedings in which the meaning of certain classification terms is determined in an adversary hearing rather than in a formal rulemaking process. The 8372 proceedings were initiated by the Bureau of Enforcement in order to determine the proper carriage classification for such items as lawn mowers, ping-pong tables, pool tables, and musical organs.

The 8372 investigation was filed by the ICC the day after ALJ Glennon ruled

against the ICC on the question of 100% compliance. There has been no final decision in this proceeding.

The question presented is whether the pendency of either of these proceedings *may,* as a matter of law, be construed to involve a carrier's "fitness" for purposes of 49 U.S.C. § 307. We conclude that by March 5, 1975, *no* question of fitness was involved, and that the refusal of the ICC to process the applications then stayed was arbitrary, capricious, an abuse of discretion, and in excess of statutory authority.

■ A carrier's "fitness" properly involves a finding that it is willing to act in accordance with the dictates of law, and that it is able to so behave. 49 U.S.C. § 307(a).

NAVL's ability to conform to the 100% compliance levels was placed in issue in the 7901 proceedings. The 100% requirement was repudiated by the ICC itself. Thus, NAVL's professed inability to meet 100% levels cannot provide a basis for finding it unable to conform its conduct to lawful requirements.

The ICC has not promulgated a new compliance level. There is thus no "requirement, rule, or regulation of the Commission" in existence which NAVL is unable to meet.

There is no contention raised in the 8372 proceedings that if the carriage classifications are decided adverse to NAVL, it will be "unable" to cease hauling the particular items.

The central issue, however, is not NAVL's inability, but its *supposed* unwillingness to abide by the ICC's rules and regulations. Such unwillingness might be shown by evidence of past uncorrected violations denoting an indifference by the carrier towards lawful standards of behavior, or a pattern of neglect of its duties towards the public that betokens a refusal voluntarily to meet its duties under the Interstate Commerce Act.

■ We hold, however, that resort by a carrier to the courts may not lawfully be

made evidence of an unwillingness to abide by the Commission's rules. Nor may a carrier's utilization of the ICC's internal appeals processes be counted as evidence of such unfitness. True, where the underlying regulations are sustained in court the seriousness of the violations may remain. But where the rule supposedly violated has been repudiated by the ICC itself, the fact that the carrier chose to challenge the rule rather than acquiesce in it is not evidence of unfitness within the meaning of 49 U.S.C. § 307.

■ Likewise, when the Bureau of Enforcement involves a carrier in a declaratory proceeding, there is no inference of an unwillingness to conform to the rules and regulations of the Commission. The purpose of the declaratory proceeding is to determine what the rule shall be. It is unclear just how a carrier can be said to have violated a rule not yet determined, or how it could be deemed to be unwilling to obey lawful requirements at a time when the requirements had not yet taken shape.

After March 5, 1975, the 7901 proceedings evolved into an investigation in the nature of a declaratory proceeding. Certainly it remains possible that the audit of NAVL will not only set a feasible compliance level, but will in the same stroke uncover violations of that new compliance level. But since there is as yet *no* "requirement, rule or regulation" by the Commission as to acceptable compliance levels, it would be absurd to determine in advance that NAVL has been unwilling to meet the yet-to-be-fixed compliance levels.

We are therefore unable to find *any* evidence of an unwillingness by NAVL to meet its lawful duties. The stays maintained by the ICC on account of the 7901 and 8372 proceedings are justifiable, if at all, because of the possibility that NAVL's conduct might some day be determined to be in violation of a future regulation, or because NAVL's refusal to sign the consent decree offered by the Bureau of Enforcement in the 7901 proceedings was evidence of an unwillingness to obey the Commis-

sion. We find neither supposed justification to be sufficient.

Our determination is supported, in part, by the history of NAVL's attempts to settle or compromise this case. Repeatedly, NAVL has sought to settle the 7901 proceedings by allowing a complete audit of its operations so as to dispel the inference that its household goods operations fail to meet reasonable requirements. ALJ Glennon found this to be an excellent manner by which the 7901 proceedings could be ended and a new regulation as to compliance levels formulated. The ICC first stayed implementation of this project, then approved it, and only recently repudiated its participation. No reasons for the stay or for the repudiation have been given. An audit was made, at NAVL's request, in the Rule 102 proceedings. The audit was conducted by ICC examiners and covered millions of operational data. The plenary solution which NAVL sought was denied, however, without mention of the audit. Indeed, the results of the audit have never been referred to by the ICC, and attempts by this court to determine from the ICC how well NAVL performed in that audit have been unsuccessful. Even NAVL has not been shown the results of the audit.

For a time it was hoped that this litigation could be avoided by the issuance of limited term certificates, pending outcome of 7901. 49 U.S.C. § 308. Counsel for the ICC represented at that time that there would be no objection to the issuance of such conditional certificates, and that in this way the fitness investigations could proceed. If NAVL were found unfit, the conditional certificates could be readily revoked.

Subsequent to this, the ICC concluded that it had no authority to issue such certificates.

NAVL has repeatedly offered to settle this suit on the basis of a 90% compliance level approved by the ICC in the *Global Van Lines* case. The "Global Settlement" was arranged in a lawsuit challenging the 100% compliance level. NAVL has offered

to sign a cease-and-desist order based on this precedent.

The ICC has determined now, however, that the 90% level is not strict enough for NAVL. It therefore has rejected all proposed settlements based upon the Global Settlement.

The ICC has rebuffed all of NAVL's efforts to lift the stays. It has refused to accord NAVL a hearing as to the propriety of the stays, has refused to indicate what evidence might persuade the ICC to lift the stays, and has then refused reconsideration on the grounds that NAVL failed to show such facts as would persuade the ICC to lift the stays. *It has refused to offer NAVL an evidentiary hearing on the issue because NAVL's petition for such a hearing has failed to show its clear entitlement to the relief to be sought in the hearing.* Finally, NAVL's petitions for reconsideration of the stays, in which NAVL urged the ICC to consider the impact of this court's decision in *North American Van Lines v. ICC, supra,* and particularly this court's discussion as to the right to a hearing, were dismissed by the ICC as not presenting "any relevant evidence, views, or arguments which might indicate that the determination to withhold a fitness finding is incorrect."

We are of the opinion that the continued withholding of decision in NAVL's application proceedings has been arbitrary, without reason, without factual or legal support, in excess of authority, beyond the limits of justifiable discretion, and tinged at times with bad faith.

■ Because the nature of the Sub–No. 170 proceedings has not yet been clarified, however, we are unable to reach any conclusion as to the propriety of the stays issued on the basis of this proceeding. The ICC's June 17 order does indicate that the violations involve failure to prevent logbook tampering, wrongful use of "gateways," and improper billing. We cannot say as a matter of law that these charges do not

relate to a carrier's willingness to obey lawful requirements. Also we must note that the Sub-No. 170 proceedings were concluded on May 2, 1975. Thus, the ICC has a long-completed record upon which to base its flagging decision, not merely a list of unproven charges. Also, the charges were found to be serious enough to deny NAVL a new products certificate in Sub–No. 170, a decision from which NAVL has not sought judicial review.

At the same time, we must note that in that same order the ICC determined that the Sub-No. 170 charges were unrelated to those in issue in 7901. The decision that the charges are or are not cross-relevant is a matter well within the discretion of the ICC, subject to the limited review provided by 5 U.S.C. § 706. We are therefore confident that our decision regarding 7901 and 8372 will not inhibit the ICC in its disposition of the Sub-No. 170 charges.[48]

### Procedural Requirements

■ The fact that the stays issued on account of the Sub–No. 170 proceedings *may* be justified does not mean that the ICC may make that determination in an ex parte manner, without notice or hearing, and without preparation of a reviewable record. Each of the stays entered, based on 7901, 8372 or Sub–No. 170, has been defective in this manner. We reiterate what was said in *North American Van Lines v. ICC, supra,* 386 F.Supp. at 678–79:

"[I]f in fact the Commission did exercise its discretion in deciding to apply the 'fitness flagging' practice in this instance, then it did commit an error of law by making that determination in an *ex parte* fashion, without notice or opportunity for hearing on the part of North American. This is a violation of the Administrative Procedure Act.

"By the terms of that Act, adjudications otherwise required by statute to be decided on the record after opportunity for an agency hearing must comply with

---

**48.** In this regard, the recent order "reopening" Sub–No. 170 and consolidating 7901 with it makes little sense, except that it ensures that

there will be a continuity of stays should 7901 be terminated.

the notice, hearing, and record requirements of the Act, 5 U.S.C. §§ 554, 556–57. It has long been held that an application of a motor carrier for a certificate of public convenience is such an adjudication and therefore covered by those requirements. *Riss & Co. v. United States*, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345 (1951); *United States v. L. A. Tucker Truck Lines*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *Pinkett v. United States*, 105 F.Supp. 67 (D.Md.1952). And it cannot be maintained that the procedural requirements do not apply because the decision to hold plaintiff's applications in abeyance is not a 'final disposition' of those matters as the term is used in the definitional section of the Administrative Procedure Act, 5 U.S.C. § 551(6). Rather, regardless of the merits of this argument, Section 9 of the Act, 5 U.S.C. § 558, provides an independent requirement that the hearing and record provisions be adhered to, even though the decision may be to postpone decision pending a future event . . . .''

After quoting the provisions of 5 U.S.C. § 558, the court continued:

"The ICC has discretion to determine that decision on certain certificate applications should be delayed during the pendency of part or all of a fitness investigation proceeding. But that discretion cannot be exercised by the Commission in an *ex parte* manner, heedless of the procedural protections which Congress has determined to provide. Not the least important of the policies underlying those procedural safeguards is that of providing for an administrative record in order to facilitate, and yet hold within proper limits, subsequent judicial review. Before the court in the present action:

There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. . . . The Commission must exercise its discretion . . . within the bounds expressed by the standard of

'public convenience and necessity.' . . . And for the courts to determine whether the agency *has* done so, it must 'disclose the basis for its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 [167–68], 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) (citations omitted).''

The decision whether to follow the Administrative Procedure Act is not a matter "committed to agency discretion," 5 U.S.C. § 701(a)(2). In determining whether to stay the application proceedings, the ICC must apply "law"—as noted above. In the first instance, the ICC must construe "fitness" under 49 U.S.C. § 307. Next, it must apply and weigh the statutory criteria listed in Section 307 in determining the relative harm that would be occasioned by withholding decision with the harm that would ensue should an unfit carrier be permitted to operate under new certificates.

But in this case especially, a firm record showing the agency's reasoning and analysis would help dispel the strong inference of bad faith. As the court once before noted:

"Furthermore, plaintiff here alleges that the ICC has linked an indeterminate delay of consideration of all applications for new grants of operating authority to the Commission's investigatory power, with the motive of economically coercing North American into accepting a decree consenting to Commission action which North American has a legal right to contest. . . . It is clear that an attempt by the Commission to utilize its powers in the manner alleged would be shocking and an illegal use of its statutory mandate.''

386 F.Supp. at 680. The course of events since that opinion was written fully demonstrates the continued need for satisfactory explanation of agency action.

In this case, every order imposing a stay was entered without notice or hearing. No

notice was ever given NAVL that it should present, in the course of its evidentiary submissions in individual application proceedings, facts and arguments showing that a pending fitness proceeding ought not serve to stay the particular proceeding. No notice was given as to which of the numerous fitness, declaratory, and application proceedings involving NAVL would be considered relevant. No notice was given as to what evidence would be relevant or persuasive. No notice was given that the flagging policy would even be considered. No opportunity for hearing, or for evidentiary submissions, was provided prior to the date of decision.

We must note that even after reading every ICC opinion related to the flagging rule, we are unsure what evidence the ICC will deem relevant to a decision not to flag; and we are likewise unsure just how an applicant is to know which of its outstanding proceedings will be found to be relevant to the stay decision. We note, for example, that the ICC has deemed a fitness investigation in the household goods area to be relevant to applications for new products authority; a declaratory proceeding has been deemed to involve a question of fitness; and a *closed* new products application proceeding has been found relevant.

The right to a hearing is not satisfied, however, unless the agency places the parties on notice as to what issues are to be determined and what standards are to be applied. "The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command." *Morgan v. United States*, 304 U.S. 1, 18–19, 58 S.Ct. 773, 776, 82 L.Ed. 1129, 1132 (1938); *Hill v. FPC*, 335 F.2d 355, 363 (5th Cir.

1964); see 5 U.S.C. § 554(b)(3). *See also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288, 95 S.Ct. 438, 443 n.4, 42 L.Ed.2d 447, 457 (1974): "A party is entitled, of course, to know the issues on which decision will turn and to be apprised on the factual material on which the agency relies for decision so that it may rebut it."

We conclude that NAVL was improperly denied the opportunity to formulate its opposition to the proposed application of the flagging rule, by denial of notice of the intended action, by denial of notice of the standards to be applied in such a determination, and by denial of a hearing at which it could fairly meet the Bureau of Enforcement's contentions. These rights are protected under 5 U.S.C. § 554.

The ICC contends that the evidentiary requirements implicit in the notice and hearing provisions of the APA may be met by "official notice" of the pendency of the investigation against the carrier. That is, the ICC may take notice of the existence of the investigation, may evaluate the impact of that investigation on the particular application proceeding, and may then enter an order staying the application proceeding based on the likely probative value of the outcome of the investigation. The ICC further contends that since the carrier is on notice as to the existence of the flagging rule and as to the existence of the investigation proceeding, the carrier suffers no injury by being permitted to submit rebuttal evidence only on a motion for reconsideration, *after* the stay is entered.

As noted above, however. the ICC has consistently applied the flagging practice as an automatic rule, not dependent on the particular circumstances of an individual application. The contents of the rule, for purposes of 5 U.S.C. § 553, and the extent of NAVL's knowledge of the rule, for purposes of 5 U.S.C. § 552, have been that the stay is to be imposed whenever any investigation has been initiated involving the carrier. In no decision of the ICC is there a hint as to what facts, if any, might justify

issuance of a certificate notwithstanding pendency of an investigation. And as noted above, NAVL's petitions to secure a hearing at which the evidentiary requirements might be explained have been denied by the ICC on the grounds that the petitions failed to allege facts which would justify lifting the stays. In short, NAVL and this court can even now only guess at what criteria the ICC in the exercise of its expertise might find relevant to rebut the inferences the ICC finds from the fact that an investigation has been instituted. Such guesswork is inconsistent with *Bowman Transportation, supra,* 419 U.S. at 288, 95 S.Ct. at 443 n.4, 42 L.Ed.2d at 457: "Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation."

Even were standards to be promulgated under which a carrier could properly prepare and present evidence in its behalf, the ICC practice of extending this right only *after* the stay decision has been determined is inconsistent with the APA's requirement of *prior* notice and hearing under 5 U.S.C. § 554.[49] The ICC urges, however, that the procedure whereby the flagging rule is applied is sustainable on the grounds that the rule is merely an evidentiary rule—a form of "official notice." By "official notice" the ICC means administrative judicial notice. Under the ICC's theory, whenever a new investigation is instituted, the various hearing officers and boards may "officially notice" the contents of the investigation and the nature of the charges therein, and may thereupon enter a decision as to the propriety of a stay. The applicant's right to present evidence is preserved as in any judicial notice situation by allowing it the opportunity to later rebut the judicially or officially noticed fact.

Judicial notice ("official notice") has been recognized in the administrative setting.

*United States v. Pierce Auto Freight Lines,* 327 U.S. 515, 529–30, 66 S.Ct. 687, 694–695, 90 L.Ed. 821, 831–832 (1946) (agency could "notice" and act upon record in parallel proceeding, as well as record developed in proceeding before it.) "[T]he mere fact that the determining body has looked beyond the record proper does not invalidate its action unless substantial prejudice is shown to result." *Id.* at 530, 66 S.Ct. at 695, 90 L.Ed. at 832.

The ICC asserts that such notice is proper within the context of the application of the flagging rule, and that such notice obviates actual notice to the parties that such action will be taken. The ICC cites 5 U.S.C. § 556(e) in support of this proposition.

Section 556(e), however, is by its terms inapplicable, inasmuch as no hearings have ever been held. Second, even if judicial notice were proper under these circumstances, the facts sought to be established by such notice are not among the classes of evidence which may be judicially noticed. Rule 201(b), Fed.R.Ev., provides: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The *pendency* of a fitness investigation would be such a fact; the contents of papers filed in that investigation might for some purposes be judicially noticeable. But the cross-relevance of the investigation to the application proceeding is not a fact "not subject to reasonable dispute," and cannot be established merely by reference to the fact that the investigation has been instituted. Such a procedure would in effect constitute a per se rule authorizing automatic flagging. Nor is cross-relevance "common knowledge." In short, the ultimate facts upon which the

---

49. Since the ICC, by its flagging rule, has determined that a carrier must demonstrate as part of its showing under 49 U.S.C. § 307 that pending, collateral investigations involving that carrier are not relevant to a determination of "fit-

ness," the carrier is entitled to know in advance of a ruling on its application that a particular investigation will be among "the matters of fact and law" to be determined. 5 U.S.C. § 554(b)(3).

propriety of granting the stay depend are not judicially noticeable.

The ICC contends that in any event the party notification provisions of 5 U.S.C. § 554(b) may be met by the provisions of 5 U.S.C. § 556(e) allowing official notice. We have noted that "official notice"—in any form—would be improper in this case because of the nature of the facts sought to be noticed. But in addition, the ICC misconstrues the meaning of "notice" in Section 556. True, a court or administrative agency may judicially notice certain facts in the course of a hearing. A party may object to the taking of such notice, and may thereafter challenge the propriety of such notice-taking. Rule 201, Fed.R.Ev.; 5 U.S.C. § 556(e). In a sense, this operates to the disadvantage of the parties, since as the ICC points out "Section 556(e) clearly assumes that notice will come after, not before, judicial notice has been taken." K. Davis, Administrative Law Treatise § 15.00, at 513 (Supp.1970). The possibility of prejudice to the parties, mentioned in *Pierce Auto Freight, supra,* is minimized by restricting the scope of official notice to matters of common knowledge or matters readily ascertainable from standard texts. But it was never thought that an agency could take advantage of the limited postponed-notification nature of judicial notice (in which the action is taken before the parties have had a chance to argue the propriety of notice-taking), by simply declaring that all the issues involved in a license application proceeding were amenable to "official notice," such that the agency could enter whatever orders it saw fit without offering the affected parties *prior* notice or opportunity for a hearing. Thus, the ICC improperly twists Professor Davis' statement (quoted above) to read: "Section 556(e) 'clearly assumes that notice [to the parties] will come after, not before, judicial [offical] notice has been taken.'" Joint Brief of the United States and the ICC, Sept. 1975, at 19 (bracketed material inserted by ICC into Professor Davis' commentary).

Since the cross-relevance of various proceedings is not a matter amendable to judicial notice, no "notice" provision relied upon by the ICC is applicable. The notice requirements of 5 U.S.C. § 554(b), and the hearing provisions of 5 U.S.C. § 554(c) are controlling. In *no* case has NAVL ever been afforded the rights provided in those sections. Accordingly, we find that every stay order has been entered "without observance of procedure required by law," 5 U.S.C. § 706(2)(d) and is therefore unlawful within the meaning of that section.

*Relief*

Title 5 U.S.C. § 706(2) provides that the reviewing court shall "hold unlawful and set aside" agency action found to violate the provisions of that section. At the minimum, we must set aside the many orders imposing the stays based on the pendency of 7901, 8372, and Sub–No. 170. We must do this not only because the stays were entered without observation of NAVL's procedural rights, but also because the issuance of the stays purportedly based on the 7901 and 8372 proceedings were improper in substance as a matter of law.

We note, however, that after this suit was filed, and after the issues had been pretried, the ICC sua sponte reopened all proceedings in order to impose the *third* (Sub-No. 170) stay. We therefore have the option of remanding each application proceeding to the ICC for consideration of the propriety of this most recent stay (since we cannot say as a matter of law that this stay was improper), in accordance with the procedural requirements of the APA; or, we may remand to the ICC those application proceedings which had been improperly stayed as of March 5, 1975, with directions to either grant or deny those applications on the then-existing record.

The following considerations guide our decision: 5 U.S.C. § 706(1) provides that the court "shall compel agency action unlawfully withheld or unreasonably delayed." As of March 5, 1975, *at the latest,* the ICC was wholly without justification in withholding its decision in the various application proceedings. There is strong evidence that the

piggy-backing of stays, the concerted effort not to allow NAVL a meaningful hearing on the issues at stake, the serendipitous discovery of new investigations just at the time old investigations were winding down, etc. is part of an over-all effort to punish NAVL for having "rocked the boat" in seeking judicial review of the Bureau of Enforcement's efforts to win "voluntary" compliance with 100% compliance with the household goods regulations. We are impressed with the magnitude of calculated delay presented by the evidence. Since 1972, NAVL has received *no* new operating authority. Its business has stagnated. When shippers considering using NAVL's services have inquired with the ICC as to what they could do, the ICC has advised them to go to NAVL's competitors. (Stipulation Ex. 29).

Based on the entire record in this case and in *North American Van Lines v. ICC, supra,* we are satisfied that we should return NAVL to the position it would have been on March 5, 1975, and that the ICC should proceed forthwith to consider the then-stayed applications on the record *then* existing, with instructions to grant or deny the application. Had the ICC acted legally, it would have then and there determined the applications. Had the ICC acted legally, NAVL would now either have its new authority or would have a reviewable final negative decision in each application proceeding. It is impossible, of course, to restore to NAVL its lost business, or make up to it the considerable energy expended in securing its clear right to an ICC determination. We are convinced that the better course is to return NAVL as much as possible to the status quo ante; if in fact the Sub-No. 170 proceedings reveal fundamental flaws in NAVL's fitness, the ICC has ample powers of revocation. Three years' loss of business is enough. *See generally* 5 U.S.C. § 706(1); *NLRB v. J. H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 265–66 & n.3, 90 S.Ct. 417, 421, 24 L.Ed.2d 405, 411–412 (1969); *Nader v. FCC,* 520 F.2d 182, 206–07 (D.C. Cir. 1975); *Deering Milliken, Inc. v. Johnston,* 295 F.2d 856 (4th Cir. 1961).

Applications which first came before the ICC after March 5, 1975, and were stayed in part because of the pendency of Sub-No. 170 or because of the supposed relevance of Sub-No. 170, present a different situation. As to these the propriety of the stays cannot be attacked as a matter of law, but the procedure by which they were imposed did not comport with the requirements of the APA. Accordingly, the stays entered in these application proceedings should be set aside, and the cases remanded with instructions that the ICC is either to grant or deny the application on the available record *or* provide NAVL with notice as to the intended application of a stay, the availability of a hearing, the issues to be therein concluded, the standards to be applied, and the questions of law and fact relevant to a decision. Compliance by the ICC with the hearing requirements of the APA is presumed as well.

NAVL's right to a determination of its earlier applications and to a hearing on the propriety of a stay as to the later applications will be illusory unless the relief granted is likely to actually "*compel* agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Ordinarily, "in the absence of substantial justification for doing otherwise, a reviewing court may not, after determining that additional evidence is requisite for adequate review, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry . . . ." *FPC v. Transcontinental Gas Pipe Line,* 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533, 540 (1976). We are faced here, however, with purposive delays by the ICC, strongly suggesting bad faith, intentionally cutting off plaintiff's business, constituting a course of unlawful conduct extending back more than three years. If ever there were a case demonstrating "substantial justification," this is it. But furthermore, our order as to the ICC stays entered prior to March 5, 1975, expressly precludes the ICC from seeking new evidence. Instead, in each application proceeding there is a completed record with which the ICC is well acquaint-

ed, requiring now only a final determination to grant or deny the new authority. Accordingly, the ICC will be given sixty (60) days from the entry of this order and judgment in which to rule upon each application which was first stayed on or before March 5, 1975. As to subsequent applications, the ICC will be expected to promptly conduct the required hearings, or otherwise determine the applications, consistent with this opinion.

NAVL's right to declaratory and injunctive relief is implicit in the discussion above.

This memorandum constitutes the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

## JUDGMENT ORDER

It is ordered, declared and adjudged that the Interstate Commerce Commission's practice or rule whereby a carrier's applications for operating authority are automatically stayed whenever an investigation or proceeding of any sort is commenced in which that carrier is involved, conflicts with and is invalid and impermissible under the Interstate Commerce Act and the Administrative Procedure Act, and has been illegally applied to plaintiff's applications for new product authority.

Further, the Interstate Commerce Commission is hereby permanently enjoined from applying to any or all of plaintiff's new products applications a rule or procedure whereby consideration of plaintiff's applications for new products authority is automatically stayed whenever another investigation or proceeding involving plaintiff is inaugurated or reopened.

And it is hereby further ordered, adjudged, and decreed that every stay order entered by the Commission in each application proceeding now before this court is vacated, and each such proceeding is hereby remanded to the Interstate Commerce Commission, and

1. as to those application proceedings in which a stay order was first entered on or before March 5, 1975, the Commission is hereby ordered to grant or deny each such application within sixty (60) days next following the date of entry of this judgment order, and the Commission is further ordered to enter such order or orders granting or denying each such application solely on the basis of the record in each such application proceeding existing as of the date on which the *first* stay in such proceeding was entered;

2. as to those application proceedings first stayed after March 5, 1975, the Commission is hereby ordered either

a. to promptly grant or deny each such application, or

b. in the discretion of the Commission, promptly to determine that a stay of any or all such proceedings *may* be appropriate because of pending investigations involving plaintiff; provided, that should the Commission so determine that a stay as to any or all such proceedings may be appropriate, the Commission shall thereupon give effective actual notice to plaintiff prior to issuing any decision as to any such stay, in which notice the Commission shall set forth the matters of law and fact in issue as well as such other information required by law, and shall offer plaintiff an opportunity for a meaningful hearing on the issues there to be concluded, such hearing to be procedurally consistent with the requirements of law, such giving of notice and holding of hearings to be consistent with the opinion and decision herein; provided further, that the Commission may, in its discretion, consolidate or join any or all such application proceedings for purposes of a determination to stay proceedings, if in the discretion of the Commission any such determination is deemed desirable, but any consolidation or joinder may not substantially impair plaintiff's right to a reasonably speedy determination.