LIGON SPECIALIZED HAULER, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

TRANSAMERICAN FREIGHT LINES, INC., Petitioner,

v.

UNITED STATES of America and the Interstate Commerce Commission, Respondents.

Nos. 77–3202, 77–3253.

United States Court of Appeals, Sixth Circuit.

Argued June 5, 1978.

Decided Nov. 14, 1978.

William E. Scent, Tarrant, Combs & Bullitt, Lexington, Ky., Bert T. Combs, Louisville, Ky., Carl U. Hurst, Jr., Madisonville, Ky., for petitioner in 77–3202.

Griffin B. Bell, Atty. Gen. of U. S., Dept. of Justice, and Kenneth G. Caplan, I. C. C., Washington, D. C., for respondents in both cases.

Joen Grant, Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Robert B. Nicholson, Mark L. Evans, Raymond M. Ripple, Interstate Commerce Commission, Washington, D. C., for respondents in 77–3202.

Thomas E. Reiss, McClintock, Donovan, Carson & Roach, Detroit, Mich., James W. Hagar, William A. Chesnutt, McNees, Wallace & Nurick, Washington, D. C., for petitioner in 77–3253.

Barry Grossman, Wm. D. Coston, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for respondents in 77–3253.

Before EDWARDS, Circuit Judge, PECK, Senior Circuit Judge, and BALLANTINE, District Judge.*

* Honorable Thomas A. Ballantine, Jr., United States District Judge for the Western District of Kentucky, sitting by designation.

JOHN W. PECK, Senior Circuit Judge.

Respondent Interstate Commerce Commission (ICC) has the responsibility under 49 U.S.C. §§ 306–07 of issuing certificates of convenience and necessity to carriers of goods in interstate commerce. Without such a certificate of convenience and necessity, a carrier cannot lawfully transport goods in interstate commerce. Before the ICC approves an application, however, it must determine that (1) the carrier is fit, willing, and able to perform the service proposed ("operational fitness"), (2) the carrier is fit, willing, and able to conform to the provisions of the Interstate Commerce Act and the requirements of the ICC ("compliance fitness"), and (3) the proposed service is warranted by the public convenience and necessity.

The ICC has employed a "flagging" procedure in considering applications for new operating authority submitted by established carriers. Under this practice, when an applicant's fitness as a carrier has been placed in issue in any formal proceeding conducted by the ICC, final disposition of any application for new authority submitted by that carrier thereafter will be stayed until the investigation pursuant to the proceeding is resolved or terminated.

Petitioner Ligon Specialized Hauler, Inc. (Ligon), a Kentucky corporation, has had, as of the filing of its main brief, fifty-seven applications for operating authority stayed under this "flagging" procedure. Petitioner Transamerican Freight Lines, Inc. (Transamerican), a Michigan corporation, has had, as of the filing of its main brief, six applications for operating authority stayed under the flagging procedure. Both Ligon and Transamerican have filed petitions seeking relief in this Court from the flagging procedures employed in their cases and to have their applications for operating authority promptly considered.[1] This relief we grant.

## I

Petitioners Ligon and Transamerican transport goods in interstate commerce as authorized under the ICC certificates of convenience and necessity. The ICC issues precise, limited certificates, listing both the exact goods to be carried and the original destination of the transportation. Because the ICC issues only product-specific and route-specific certificates, virtually all new business secured by a carrier must be approved by the ICC. A carrier's business will thus stagnate unless it obtains new certificates of convenience and necessity in order to meet the transportation needs of new customers and the new shipping demands of old customers. See North American Van Lines, Inc. v. United States, 412 F.Supp. 782, 785 (N.D.Ind.1976) (NAVL II); R. Fellmeth, The Interstate Commerce Omission 120–21 (1970). This effect of the ICC flagging procedure must be kept in mind as we review the factual background of Ligon's and Transamerican's petitions to this Court.

### NO. 77–3202

On November 9, 1972, Ligon filed with the ICC an application, numbered MC–119777 (Sub-No. 245), for a certificate of convenience and necessity in order to transport certain commodities (valves, fittings, hangers, gaskets, hydrants, forgings, castings, pipe, sprinkler heads, connections, heaters, and parts and accessories for these commodities) between the plant sites and warehouse facilities of ITT Grinnel Corporation in nine southern and western states. The ICC Bureau of Enforcement replied that the Bureau would participate in the hearing on Sub-No. 245, primarily with respect to the issue of the "fitness" of Ligon. At this time, Ligon had many other applications for additional operating authority pending before the ICC, applications which had been approved but which had not been fully processed. After Ligon's application in Sub-No. 245 the ICC refused to issue the

---

1. Case No. 77–3202 and Case No. 77–3253 were separately briefed and argued in this Court; however, the same legal questions were presented in the two cases. Hence, this opinion consolidated treatment of the two cases.

certificates, an action which constituted an informal flagging of these applications.

The ICC then reopened an earlier application for further consideration of Ligon's fitness. The ICC had found Ligon fit in that application and had granted Ligon authority, which was for the transportation of lumber and lumber products from Leola, Sheridan, and Pine Bluff, Arkansas to points in fifteen southern and midwestern states. This was the first formal ex parte flagging order that ICC entered against Ligon. All subsequent Ligon grants of authority flagged by formal order were, until late 1976, by the ICC's own action, either held open or reopened for further consideration of Ligon's fitness at a date subsequent to the final determination of that issue in Sub-No. 245.

By the time formal hearing on Sub-No. 245 was held, the ICC had withheld twelve grants of authority to Ligon. During the period of time between the close of the Sub-No. 245 hearing and the filing of the administrative law judge's decision nearly a year later, the ICC flagged eleven additional grants of authority to Ligon.

On September 23, 1974, an administrative law judge determined in Sub-No. 245 that Ligon was fit and that Ligon should be given a grant of authority. Approximately one month later, the ICC's Bureau of Enforcement filed exceptions to the administrative law judge's recommended order. The exceptions did not challenge the administrative law judge's finding as to Ligon's fitness and merely sought some changes in the findings of fact made by the judge. Consequently, Ligon promptly replied that it agreed with the Bureau and urged that a ruling on the exceptions be expedited so that Ligon's applications for authority being flagged due to the question of Ligon's fitness in Sub-No. 245 could be processed. Nevertheless, the ICC took no action with respect to Sub-No. 245 for more than one year after the administrative law judge rendered his report. Moreover, the ICC continued to flag Ligon's applications for certificates of operating authority, even in a number of applications in which Ligon was found fit.

Following an investigation by the ICC's Bureau of Enforcement, the ICC instituted two complaint proceedings against Ligon and several other companies. On October 7, 1975, the ICC's Bureau of Enforcement filed a petition for further hearing on Ligon's fitness in Sub-No. 245 and for consolidation of that hearing with the two complaint proceedings. Ligon protested that the delays were costing it much revenue because the flags on its applications for certificates of operating authority remained in effect. Despite this protest, the ICC reopened Sub-No. 245 and consolidated it with the two complaint proceedings, in accordance with the request of the ICC's Bureau of Enforcement. Ligon petitioned the ICC to reconsider that decision, but the request was denied.

On March 1, 1976, Ligon filed a petition with the ICC to have certificates of operating authority issued in fifty-two pending application proceedings. This petition was accompanied by an affidavit of Herbert A. Ligon, Jr., who stated that because of the flagging Ligon had lost and was continuing to lose 15,808 to 23,712 shipments annually and $8.7 million to $13 million in revenues. The ICC's Bureau of Enforcement did not reply to or oppose Ligon's petition until the ICC issued a show cause order on September 15, 1976. Still, the ICC delayed for seven months ruling on Ligon's petition but then on September 29, 1976, denied Ligon's application, except with respect to two applications.

By this time, the ICC was following a new flagging procedure. On July 28, 1976, the ICC had issued an order in Ex Parte No. 55 (Sub-No. 23), setting forth fitness flagging procedures, which were proposed rules governing flagging. The order was issued as a result of the decision in NAVL II, supra, 412 F.Supp. 782. In that case, a three-judge district court held that the ICC's ex parte practice of automatically flagging all applications of a carrier for operating authority wherever the carrier's fitness was in question in any one application was unlawful because it was arbitrary

under the Administrative Procedure Act and because it was in excess of statutory authority under the Interstate Commerce Act. The ICC did not appeal that decision but instead instituted rules to govern flagging in an apparent effort to make the practice of flagging lawful under the *NAVL II* decision.

These rules provided for a show cause hearing when an application was made by a carrier for operating authority and the carrier had applications flagged because of the question of the carrier's fitness. The proposed procedures were made immediately applicable to carriers subject to fitness questions.

In the case of Ligon, on September 15, 1976, the ICC issued a show cause order. As directed by the order the Bureau of Enforcement filed *unverified* assertions of fact alleging improper conduct of Ligon which the Bureau claimed, if proven, would support findings of Ligon's unfitness. The Bureau contended that the widespread and significant violations of law by Ligon constituted a "nexus" between these matters and the flagged applications for operating authority. The establishment of that nexus was necessary under *NAVL II* to justify flagging. Also as directed by the show cause order, Ligon filed *verified* written representations to the effect that Ligon had been found fit after the administrative law judge's consideration of all the Bureau's alleged violations in Sub-No. 245; that Ligon had voluntarily terminated all operations complained of by the Bureau in the complaint proceeding although Ligon did not believe such operations to be improper; that Ligon could not determine what conduct on its part the Bureau considered improper in MC–F–12631; that Ligon had offered to correct any of its operations questioned by the Bureau in the complaint proceedings MC–C–8735 and MC–F–12631; and that the Bureau had refused to advise Ligon as to what conduct was questionable in MC–F–12631 or what steps Ligon could take to bring Ligon into compliance with the law with respect to matters alleged to be improper in MC–C–8735 and MC–F–12631. Ligon denied that there was any

nexus between the complaint circumstances and the operations that Ligon would be performing under the pending authorities. However, on September 29, 1976, the ICC denied Ligon's petition.

Since the first show cause order of September 15, 1976, under the proposed ICC rules, Ligon has had six further applications for operating authority flagged to bring the total to fifty-seven applications flagged as of the filing of Ligon's main brief in this appeal. All the applications that are being withheld are being flagged as a result of the pendency of Sub-No. 245.

Ligon filed a petition for reconsideration of the September 29, 1976, order of the ICC, but the ICC denied Ligon's petition for reconsideration. It is this order of the ICC, dated February 11, 1977, for which review is sought in this Court.

## NO. 77–3253

The ICC first invoked its flagging practice against Transamerican in a December 22, 1975, order, MC–10761 (Sub-No. 240). In that order, the ICC responded to Transamerican's application for permanent extension of ten certificates of convenience and necessity, which had been limited by three year periods of authority, by extending the authority of those certificates until the ICC could consider the matters with respect to those certificates for final decision in light of proceedings in four of Transamerican's other applications for operating authority. Certificates had been authorized to be issued in those four applications but the order reopened the proceedings.

Subsequent to that order, the opinion of *NAVL II, supra*, 412 F.Supp. 782, was rendered and the ICC published its proposed fitness flagging procedures in *Ex Parte 55*. On September 23, 1976, the ICC served a show cause order on Transamerican, in accordance with the proposed flagging procedures, directing Transamerican to inform the ICC whether good cause existed for withholding issuance of certificates in Transamerican's applications to the ICC for

operating authority. Transamerican and the ICC's Bureau of Enforcement made the submissions as called for in the show cause order. The Bureau cited numerous instances of Transamerican violations of the Interstate Commerce Act and the regulations thereunder. The Bureau noted that Transamerican paid four civil forfeiture settlements, during the period from 1967 to 1972, each pursuant to discovery of transportation performed beyond the territorial scope of its certificates and thus in violation of the Interstate Commerce Act. Transamerican in verified written representations contended that the Bureau had failed to discharge its burden of showing a nexus between the violations charged and the operations proposed in the application proceedings.

On December 23, 1976, the ICC issued an order stating that Transamerican's applications would be held open for further consideration of Transamerican's fitness. Transamerican filed a petition for reconsideration, which was denied. Transamerican has brought its appeal from these two orders of the ICC.

## II

The earliest published explanation of flagging by the ICC or an ICC member is contained in the dissent of Commissioner Bush in *John L. Kerr and C. O. Kerr, Jr. Extension-Mississippi*, No. MC 66746 (Sub-No. 10), 1970 Federal Carrier Cases ¶ 36,376 (December 1969):

> The term "flagging"; the procedure of its usage; and the potential, and real, harmful and probably illegal results of its practice should be explained next.
>
> A general example would develop when a licensed interstate motor carrier files an application to increase or extend its authority and the ICC's Bureau of Enforcement decides (because of a competitor carrier's complaint, or for any reason) to enter the case to *investigate* the *possibility* that the application should be denied on the grounds of "fitness". The Director of the Bureau of Enforcement may then, and usually does, order that *all* pending or subsequent applications of the carrier—pertaining to any area of its operations in the United States—be "flagged" in the Commission's office.
>
> Nowhere do I find a clear definition of "fitness". Nor do I find any explanatory treatment of the important element of *degree* of "fitness". Nor how long the "flags" may continue to prevent the staff of the Commission from resuming the processing of the *other* applications on which the "flags" have been almost *automatically* raised. Nor how long the carrier may be considered by the Commission, his competitors, his customers, etc., to be "unfit", if that decision is finally determined in the one case being investigated.

An extensive explanation of the flagging practice prior to *NAVL II* was finally given by the ICC in an ICC order, dated September 23, 1975, in *North American Van Lines, Inc.*, MC–C–7901, 386 F.Supp. 665.

> "[T]he issue of a carrier's fitness involves two separate considerations, (1) the applicant's fitness, willingness and ability to perform a particular operation (operation fitness), and (2) its fitness, willingness, and ability to conform to the Act and the Commission's rules and regulations thereunder. . . . [W]hile the issue in (1) may involve matters related only to a specific proceeding, those in (2) constitute a general issue which can be resolved by consideration of its status as revealed through the records in all its pending proceedings. . . . [I]n the instance where this second overriding aspect of a carrier's fitness has been raised as an issue in a particular case . . . the question of a carrier's fitness, willingness, and ability to conform its operations to lawful requirements is a matter that relates to all its pending proceedings and this issue, by statute, must be resolved before any certificate may be issued. . . [I]t is a long-established Commission policy . . . to withhold issuance of new authority . . . to any applicant while such carrier's fitness is under investigation in a formal proceeding. . . "

*NAVL II, supra*, 412 F.Supp. at 791–92.

This flagging practice was first challenged in *NAVL I, supra*, 386 F.Supp. 665.

In that case, North American Van Lines, Inc. had twenty-four applications for operating authority flagged and brought an action seeking mandamus relief. The *NAVL I* court

> . . . ruled that while a carrier's "fitness" is clearly an appropriate criterion to be considered in determining new products applications, and while the ICC may consider the record of parallel proceedings in reaching its determination, the Interstate Commerce Act does not delegate to the ICC "the power to institute a rule withholding *all* certificate applications any time and every time there is a carrier investigation pending, regardless of [the] facts concerning the individual [new products] application[s] and the nature of the complaint at issue in the [fitness] investigation." 386 F.Supp. at 676 (emphasis in original). " '[F]itness' in respect to new certificate applications is a case-by-case determination (so long as there is no consolidation of cases)." *Id.* at 677. The court therefore held that NAVL was entitled to a hearing and determination under 5 U.S.C. §§ 556–58 (Administrative Procedure Act) as to whether it was appropriate to stay the new products applications in light of the 7901 proceedings. ICC was mandated either to issue the certificates in question, or to provide NAVL with a meaningful hearing at which facts relevant to the propriety of issuing the stays could be considered *in advance of* the decision to stay proceedings (footnotes omitted).

*NAVL II, supra,* 412 F.Supp. at 788.

The decision in *NAVL I* was not appealed. But the ICC denied the petitions of North American Van Lines, Inc. to have the requested certificates issued and continued to hold open North American's applications for further consideration of that carrier's fitness. North American Van Lines, Inc. again filed suit and the legality of flagging was again considered.

The *NAVL II* court determined that a certain type of flagging rule was permissible:

Supposing that a disreputable carrier committed such serious violations of the Interstate Commerce Act and the ICC's regulations thereunder that the carrier's very willingness to conform its behavior to lawful requirements was placed in issue: would the ICC be required to routinely process the carrier's applications for new operating authority during the pendency of a formal fitness or revocation proceeding? Plainly not. *North American Van Lines v. ICC, supra,* 386 F.Supp. at 676. A rule *allowing* withholding of decision, in *appropriate* cases, surrounded with procedural safeguards required by the Administrative Procedure Act, would be fully in harmony with the purposes of the Interstate Commerce Act.

*NAVL II, supra,* 412 F.Supp. at 795–96. The ICC had argued to the *NAVL II* Court that the flagging procedure was such a permissible rule applied only after a consideration between the individual application proceeding and the outstanding fitness inspection, and was therefore lawful, but that contention was emphatically rejected.

[T]he ICC stays *all* of a carrier's pending license application proceedings upon the filing of an investigation by the Bureau of Enforcement against the carrier. The stays are imposed immediately upon the filing of the investigation, whether or not the investigation is truly a fitness investigation, and are not lifted until the investigation has been fully terminated or dismissed. The stays are automatically imposed whether or not the charges in the investigation are proved, unproved, or disproved. The decision to impose the stay is made ex parte, *without* the formal taking or recording of evidence relevant to the decision, and *without* furnishing factual findings upon which a reviewing court could determine that the ICC had in fact exercised its discretion within permissible limits.

We conclude that the ICC's statutory duty under the Interstate Commerce Act to determine a carrier's fitness in an application proceeding may not be fulfilled by the expedient of promulgating an in-

formal rule automatically withholding a fitness determination whenever an investigation involving the carrier is filed by the ICC's Bureau of Enforcement. We conclude that such a rule is arbitrary within the meaning of 5 U.S.C. § 706(2)(A), that it is in excess of statutory authority under 49 U.S.C. § 307 within the meaning of 5 U.S.C. § 706(2)(C), that it therefore is unlawful within the meaning of 5 U.S.C. § 706(1). The delay attendant upon the application of the rule is not reasonable, within the meaning of 5 U.S.C. § 558(c) and 5 U.S.C. § 706(1). (footnotes omitted).

*NAVL II, supra,* 412 F.Supp. at 798–99.

In response to the holding in *NAVL II,* the ICC published in the Federal Register, 41 Fed.Reg. 33309–33311 (August 9, 1976), a notice of proposed rulemaking, *Ex Parte No. 55,* designed to conform the ICC flagging procedures to the legal requirements set forth in *NAVL II.* Under those rules, "fitness flagging" is considered by the ICC when there is a threshold occurrence signaling possible flagging issues; the threshold occurrence might be either the institution of a formal ICC investigation into alleged carrier violations of law or the participation by the ICC's Bureau of Enforcement or the Department of Transportation in an application proceeding.[2] If these occur, a "show cause" procedure is set in motion by an order stating the law purportedly violated and the substance of the allegations made against the applicant carrier and identifying the pending applications in which fitness flagging is to be considered. The order also requires the Bureau of Enforcement or Department of Transportation to advise the applicant carrier of "all matters of fact and law to be asserted with sufficient particularity to make clear the violations alleged and the nexus alleged to exist between those violations and the application proceeding in which the fitness flagging is being considered" within ten days. The applicant carrier is then given twenty days to submit verified written representations to show cause why all or any of its applications should not be flagged for fitness. The Bureau of Enforcement or Department of Transportation has fifteen days to reply.[3]

When the ICC announces its decision to flag or not to flag, the ICC is to set forth "at least in general terms, its findings with respect to the publicly announced standard and specify the particular applications to which those findings and the fitness flag, if

2. § 1109.1 *Threshold Occurrence Signaling Possible Flagging Issues*
 a. Institution of a formal Commission investigation into alleged violations of law that *reasonably appear to bear on applicant's fitness,* willingness, and ability to conduct regulated carrier operations;
 b. Participation by the Bureau of Enforcement or the Department of Transportation to develop a record concerning fitness in an application proceeding seeking ICC operating authority or approval of a transaction under section 5 of the Act.
 This proposed regulation was adopted with only grammatical modifications in 49 C.F.R. § 1067.2.

3. § 1109.6 *Flagging Consideration to be by Show-Cause Procedure with Opportunity to be Heard*
 When the decision is to consider the flagging of pending applications, either the order authorizing the Bureau of Enforcement or DOT to participate on the issue of fitness, or a separate show-cause order issued as a matter of convenience, will state in general the statutes, requirements, rules, and regulations allegedly violated and the general substance of the allegations made; identify by individu-

al docket numbers all of those pending application proceedings in which fitness flagging is to be considered. The order, served and docketed in the usual manner, will require the Bureau of Enforcement or the Department of Transportation within 10 days from its issuance to advise applicant in writing of all matters of fact and law to be asserted with sufficient particularity to make clear the violations alleged and the nexus alleged to exist between those violations and the application proceeding in which fitness flagging is being considered; afford applicant an opportunity to submit within 20 days thereafter any verified written representations including facts and arguments tending to show cause why all or any of its applications should not be flagged for fitness, and afford the Bureau of Enforcement or the Department of Transportation 15 days to reply to applicant's representations.
 This proposed regulation was adopted with certain modifications in 49 C.F.R. § 1067.7. The adopted regulation provides the following:
 When the decision is made to consider the flagging of pending applications, in addition to any order authorizing the Bureau of Investigations and Enforcement or DOT to partici-

any, apply." [4] The flagging regulations also provide that the ICC action on flagging is not to be construed as a decision on the question of an applicant's fitness,[5] that fitness flagging procedures may be initiated at any stage of any application proceeding,[6] that any new application for operating authority will be automatically added to the list of designated flagged proceedings,[7] that all pending applications affected by flagging considerations or designated as flagged will have findings of fitness with-

pate on the issue of fitness, a separate show-cause order will be issued. It will state, in general, the statutes, requirements, rules, and regulations allegedly violated and the general substance of the allegations made and identify by individual docket numbers all of those pending application proceedings in which flagging is to be considered. The order, served and docketed in the usual manner, will require the Bureau of Investigations and Enforcement or the Department of Transportation within 15 days from its issuance to advise applicant, in writing, of the matters of fact and law to be asserted with sufficient particularity to make clear the violations alleged and the nexus alleged to exist between those violations and the application proceeding in which fitness flagging is being considered. Allegations of nexus may include, but are not limited to, such factors as commodity similarity, territorial similarity, the time frame of the alleged violations (whether isolated instances or a pattern of continuing violations), or the seriousness of the alleged violations in light of the authority sought. The order authorizing the Bureau of Investigations and Enforcement or DOT to participate on the issue of fitness or the separate show cause order shall afford applicant an opportunity to submit within 20 days from the expiration of the above-stated notice any verified written representations including facts and arguments tending to show cause why all or any of the applications identified in the order should not be flagged for fitness, and will afford the Bureau of Investigations and Enforcement or the Department of Transportation 15 days to reply to applicant's representations.

**4.** § 1109.9 *Flagging Decision Announced by Commission or Division Thereof*

Upon determination that the applicant has shown that the fitness flag should not be raised or has failed to make such showing with respect to any or all of the designated applications, the Commission or the appropriate Division thereof will issue an order setting forth, at least in general terms, its findings with respect to the publicly announced standard and specify the particular applications to which those findings and the fitness flag, if any, apply. Commission action on the fitness flagging issue is not a decision on the question of applicant's fitness, and shall not be construed as such.

This proposed regulation was adopted with no substantive modification in 49 C.F.R. § 1067.10.

**5.** See footnote 4.

**6.** § 1109.10 *Flagging Procedure May be Initiated Where Warranted at Any Stage of Proceeding*

Should a determination be made that a fitness flagging procedure is not warranted or should a fitness issue not be raised at the outset and a situation develop at a later stage of any proceeding that suggests that flagging appears appropriate, flagging may be presented as an issue upon formal petition under these same announced procedures.

This proposed regulation was adopted in 49 C.F.R. § 1067.11.

**7.** § 1109.11 *New Application Filed After Commencement of Fitness Proceeding*

Where there is fitness participation in an application proceeding by the Bureau of Enforcement or the Department of Transportation and either fitness flagging is under consideration or a fitness flag has been raised, a new application by the same applicant will by notice be added to the list of designated proceedings unless with the application there is filed a petition, a copy of which is served on the Bureau of Enforcement or the Department of Transportation, as appropriate, to have it excluded therefrom. The petition must set forth applicant's alleged justification for such exclusion and action thereon will not be taken sooner than 30 days after notice of the application is published in the Federal Register. Action on the petition will be by an order of the Commission or a Division thereof and governed by the announced standard.

This proposed regulation was adopted with certain modifications in 49 C.F.R. § 1067.12. The adopted regulation provides the following:

Where the Bureau of Investigations and Enforcement or the Department of Transportation has been authorized to participate in an application on the issue of fitness flagging procedures have been initiated, a new application by the same applicant filed subsequent to the service date of the show cause order will by notice be added to the list of designated proceedings in the show cause order unless with the application there is filed a petition, a copy of which is served on the Bureau of Investigations and Enforcement or the De-

held,[8] that any flagging order by the ICC will be subject to petitions for reconsideration under the ICC's Rules of Practice,[9] and that a final finding on the fitness issue adverse to an applicant carrier will result in all flagged proceedings being denied.[10] The standard set for flagging a carrier's applications for operating authority is the existence of allegations challenging the fitness of the carrier to conform to the law, or allegations establishing that there is probable cause to believe that ultimately the applicant will not be able to meet the statutory requirements for the issuance of certificates for granting authority.[11]

The flagging regulations as adopted substantially conform to the provisions of the proposed regulations, except that the final regulations change certain time periods in the show-cause procedures and specify with greater particularity the factors which the Bureau of Enforcement or Department of Transportation is to employ in advising carriers of the alleged nexus between the pending applications and the fitness investigation. The final regulations were adopted and became effective on May 9, 1977, at 49 C.F.R. § 1067.

## III

### Jurisdiction

Petitioners Ligon and Transamerican invoked this Court's jurisdiction pursuant to

partment of Transportation, as appropriate, to have that application excluded therefrom. The petition must set forth applicant's alleged justification for such exclusion. Action on the petition will be taken in the decision determining the application, and will be governed by the standard contained in § 1067.3.

**8.** § 1109.12 *Processing Pending Applications*

All pending application proceedings affected by flagging consideration or designated as flagged will move forward toward a final disposition of all other issues, but all findings on fitness will be withheld. Any proceeding that has otherwise reached administrative finality but has not resulted in the issuance of operating rights or, in the case of finance proceedings, authority to consummate the transaction, prior to its designation for show-cause fitness flagging consideration, will by such designation be reopened or held open for reconsideration on the issue of fitness until it is either determined that flagging is not warranted, the fitness issue is resolved, or the fitness flag is removed.

This proposed regulation was adopted in 49 C.F.R. § 1067.13.

**9.** § 1109.13 *Commission Review of Show-Cause Order*

Applicant's filing or representations under the show-cause order serves as a prompt and adequate opportunity for Commission review of that order, and may include a prayer for reconsideration of the issuance of the show-cause order, if applicant believes it appropriate. No separately-filed petition for reconsideration will be entertained. Any decision to flag or not to flag will result in issuance of an order by the Commission or a Division thereof in all proceedings where flagging is contested and that order will be subject to petitions for reconsideration under the Commission's rules of practice and will be disposed of as promptly as possible.

This proposed regulation was adopted in 49 C.F.R. § 1067.14.

**10.** § 1109.16 *Effect of Adverse Fitness Finding on Other Proceedings*

Where the fitness flag has been raised, an administratively final determination that applicant has failed to show that it is fit will provide a sufficient basis for disposition of all designated pending applications. Following an administratively final ultimate finding unfavorable to applicant, all flagged proceeding may be denied by appropriate order.

This proposed regulation was adopted with no substantive modification in 49 C.F.R. § 1067.16.

**11.** § 1109.2 *Standard for Flagging*

Allegations challenging the fitness, willingness and ability of an applicant to conform to the provisions of the Act and the requirements, rules and regulations of the Commission thereunder, as to which there is probable cause for believing that ultimately the applicant will not be able to meet statutory requirements for favorable Commission action on an application for operating authority or for authority to undertake a financial transaction within the meaning of Section 5(2) of the Act, including:

a. Past uncorrected or other significant violations denoting an indifference by the applicant towards lawful standards of behavior, or a pattern of neglect of its duties towards the public that betokens a refusal voluntarily to meet its duties under the Interstate Commerce Act; or

b. Flagrant and persistent disregard of pertinent provisions of the Act or our lawful requirements, rules, or regulations (rather than, for instance, a *bona fide* difference of opinion or interpretation regarding the carrier's rights).

This proposed regulation was adopted with no substantive modifications in 49 C.F.R. § 1067.3.

the provisions of 28 U.S.C. § 2321(a) and 28 U.S.C. § 2342(5). These statutory sections provide that the Courts of Appeals shall have jurisdiction of proceedings instituted to enjoin or suspend rules, regulations, and final orders of the ICC.[12] The question here is whether the ICC's flagging orders are final orders for the purposes of the relevant jurisdictional statutes so as to give this Court jurisdiction. We hold that we do have jurisdiction.

■ The ICC argues that flagging orders are not final orders, but are entirely procedural and interlocutory in nature. The ICC acknowledges the fact that courts are not bound by descriptive titles placed upon orders of an administrative agency, see *Rochester Telephone Corp. v. United States*, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939), but insists that there must be a showing that legal consequences will flow from the order from which judicial review is sought. See *Pennsylvania R. R. Co. v. United States*, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960). The ICC asserts that flagging is a procedural order that does not directly and immediately affect a carrier's rights.[13]

■ We find the ICC's description of their flagging orders to be unsatisfactory. It stands in stark contrast to the experiences of Ligon and Transamerican with the flagging practice and to the history of the flagging rule that we have just recounted. Those flagging orders issued after many years of proceedings before the ICC, vitally affect the business of those companies be-

cause of the resultant delay. When such delay is unreasonable or is imposed by procedures that do not comport with law, then there are legal consequences which make the flagging orders reviewable as final orders. The *NAVL II* court makes this point quite clearly:

Although a stay order is not a final adjudication of the merits, but rather is in the form of an interlocutory order, the "finality" requirement . . . is met, and the order is reviewable, if the order is "final" in its general sense—"sufficiently final to be appropriate for judicial review." *North American Van Lines v. ICC, supra,* 386 F.Supp. at 681, and cases there cited. And since 5 U.S.C. § 706(1) provides a remedy for administrative action unlawfully withheld or unreasonably delayed, the withholding of certificates and the purposeful delay in processing applications must at some point be judicially reviewable if Section 706(1) is to have effect. That point is reached, as here, where the decision to delay or withhold action has become concrete, and where the agency's firm commitment to the decision is evidenced by affirmative actions on its part.

412 F.Supp. at 793. Administrative action would, of course, be unlawfully withheld by the agency if it is found that the action is taken without observance of procedures required by law. 5 U.S.C. § 706(2)(D).[14]

### Scope of Review

The ICC wisely did not attempt to dispute in this Court the wisdom of the holdings in *NAVL I* and *NAVL II*. There is no

---

**12.** 28 U.S.C. § 2321(a) provides:

Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title.

28 U.S.C. § 2342(5) provides:

The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

. . . . .

(5) all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

**13.** The ICC does not argue here, as it did in *NAVL II*, that the flagging practice is a matter "committed to agency discretion by law." 5 U.S.C. § 701(a). That argument was properly rejected in *NAVL II, supra,* 412 F.Supp. at 793.

**14.** At oral argument, Government counsel frankly admitted the weakness of the ICC's position on this jurisdiction issue.

question but that these two decisions correctly defined the legal limitations on fitness flagging and that had the ICC not acted to institute the flagging regulations which were applied to Ligon and Transamerican we would simply adopt the reasoning set forth in those opinions and grant Ligon and Transamerican the relief they have requested. But the ICC did institute fitness flagging regulations and employed the interim regulations to the carriers in this case. The ICC thus contends that if this Court determines that it has jurisdiction, then there is a narrow standard of review for this Court to employ. The ICC states that the sole question is whether the agency abused its discretion in holding in abeyance Ligon's and Transamerican's applications for operating authority pending definitive determinations of the fitness of those carriers.

We do not agree. The ICC fails to consider the relevant provisions of the Administrative Procedure Act concerning agency action that is withheld or delayed, which would apply to fitness flagging—or assumes that those provisions are satisfied by the show-cause flagging procedures. The *NAVL II* court succinctly described the operation of the applicable provisions of the Administrative Procedure Act.

> Under 5 U.S.C. § 706(1) the reviewing court may "compel agency action unlawfully withheld or unreasonably delayed." The "agency action" involved in this suit which has been withheld or delayed is the final determination of NAVL's applications. "Unlawful," as the term is used in Section 706(1), includes but is not limited to the meaning given in Section 706(2):
>
> "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (D) without observance of procedure required by law." If some or all of the applications have been unlawfully subjected to flagging, then the delay suffered by NAVL would be unreasonable as well.
>
> (Footnotes omitted.)

412 F.Supp. at 794.

We must therefore determine whether the ICC actions have been consistent with the Administrative Procedure Act. Under that Act, two main issues are raised. First, do the ICC's show-cause procedures, which were embodied in the interim flagging regulations applied to Ligon and Transamerican, meet the requirements of the Act? If not, then 5 U.S.C. §§ 706(1) and 706(2)(D) have been violated. Second, did the ICC abuse its discretion in flagging Ligon's and Transamerican's applications for operating authority? If so, this Court may order appropriate relief.

**IV**

The ICC argues that the show-cause regulations are essentially procedural, not requiring compliance with formal rule-making procedures, see 5 U.S.C. § 553(b), and that the only question in this appeal is whether the ICC abused its discretion in applying those procedures. This contention, however, begs the very important question as to whether the show-cause regulations satisfy the requirements in the Administrative Procedure Act for administrative adjudicatory proceedings.

When the ICC announced the interim flagging regulations it properly conceded that the section in the Administrative Procedure Act governing adjudications, 5 U.S.C. § 554, was applicable to fitness flagging proceedings. "It has long been held that an application of a motor carrier for a certificate of public convenience is such an adjudication and therefore covered by those requirements [of the Act, 5 U.S.C. §§ 554 & 556–57, the adjudicatory provisions of the Administrative Procedure Act.]" *NAVL I, supra*, 386 F.Supp. at 679, quoted in *NAVL II, supra*, 412 F.Supp. at 803, citing *United States v. C. A. Tucker Truck Lines*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), and *Riss & Co. v. United States*, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345 (1951); *Pinkett v. United States*, 105 F.Supp. 67 (D.Md.1952). *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d

207 (1962); 5 U.S.C. §§ 554(a) and 558(c).[15] An examination of the application of 5 U.S.C. § 554 to this case is thus in order.

Section 554(b) of Title 5 in the United States Code provides in pertinent part:

(b) Persons entitled to notice of an agency hearing shall be timely informed of—

(1) the time, place, and nature of the hearing;

(2) the legal authority and jurisdiction under which the hearing is to be held; and

(3) the matters of fact and law asserted.

In *Ex Parte 55*, the ICC stated that the show-cause procedure complied with the requirements of § 554(b) and we agree.

Section 554(c) of Title 5 of the United States Code then provides:

The agency shall give all interested parties opportunity for—

(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.

This section thus incorporates the formal hearing requirements of 5 U.S.C. §§ 556 and 557 absent a settlement of the controversy. Sections 556(a) and 557(a) of Title 5 of the United States Code make this incorporation clear. Section 556(a) provides the following:

This section applies, according the provisions thereof, to hearings required by section 553 or 554 of this title to be conducted in accordance with this section. And § 557(a) provides the following:

This section applies, according to the provisions thereof, when a hearing is required to be conducted in accordance with section 556 of this title.

The question before us is thus whether the show-cause procedure adopted by the ICC and applied to Ligon and Transamerican complied with the hearing requirements of the Administrative Procedure Act. The relevant subsections in §§ 556 and 557 are § 556(d) and § 557(c). Section 556(d) provides in pertinent part the following:

Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. . . . A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts.

Section 557(c) provides the following:

Before a recommended, initial, or tentative decision, or a decision on agency

**15.** 5 U.S.C. § 554(a) provides:
This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved—

(1) a matter subject to a subsequent trial of the law and the facts de novo in a court;

(2) the selection or tenure of an employee, except a hearing examiner appointed under section 3105 of this title;

(3) proceedings in which decisions rest solely on inspections, tests, or elections;

(4) the conduct of military or foreign affairs functions;

(5) cases in which an agency is acting as an agent for a court; or

(6) the certification of worker representatives.

5 U.S.C. § 558(c) provides in pertinent part:
When application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision.

review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit for the consideration of the employees participating in the decisions—

(1) proposed findings and conclusions; or

(2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions; and

(3) supporting reasons for the exceptions or proposed findings or conclusions.

The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—

(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record; and

(B) *the appropriate rule, order, sanction, relief, or denial thereof.*

■ These statutory provisions clearly mandate that in the context of a fitness flagging proceeding, there be a hearing at which the Bureau of Enforcement or Department of Transportation bears the burden of proving that the carrier's applications for operating authority should be flagged and at which the carriers have the opportunity to submit oral or documentary evidence, to conduct necessary cross-examinations, to submit rebuttal evidence, and to submit proposed findings and conclusions. After the hearing the ICC must render a decision that clearly indicates the basis upon which the agency exercises its authority. *See Burlington Truck Lines, Inc. v. United States, supra,* 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207.

■ It should be obvious that the show-cause procedures fail to give carriers the hearing rights under the Administrative Procedure Act to which they are entitled in fitness flagging proceedings. Under the show-cause procedures, the Bureau of Enforcement or Department of Transportation files a statement that contains the allegations against the carrier and the asserted relationship of the allegations and the application proceeding, and all a carrier can do is to submit to the ICC verified written representations to show why flagging should not occur, to which the Bureau of Enforcement or Department of Transportation may respond in rebuttal. Solely on this basis, the ICC may flag—and did in this case—all applications for certificates of operating authority that a carrier has pending before the ICC. The Bureau of Enforcement or Department of Transportation does not truly bear the burden of proof. All that the Bureau of Enforcement or Department of Transportation submits are allegations as to violations by carriers, not proof, and on the basis of those allegations the ICC may order fitness flagging. Nor does the carrier have the opportunity to submit evidence other than through verified written representations, to conduct cross-examination, to submit rebuttal evidence, or to submit proposed findings and conclusions.

This failure of the show-cause procedures to conform to the hearing provisions of the Administrative Procedure Act stems from the ICC's erroneous view of the applicability of the Act to fitness flagging proceedings, a view contained in the ICC's order in *Ex Parte 55*:

It must be stressed that in the *show cause hearing* (which concerns the withholding of issuance of authority pending a determination of applicant's fitness in the selected application) the issue to be determined is nexus *not* fitness (which is determined in the selected application). Consequently, efforts by applicants to "try" fitness issues in the show cause hearing (E. G., the violations alleged never occurred) will not be entertained. A show cause hearing may occur before the hearing in the selected application. To attempt to have the Bureau or DOT present detailed evidence of the violations, including evidence contained in notes, memoranda, reports, interviews, etc., in the show cause hearing would, therefore, be inappropriate as a trial of

nexus. An allegation is the statement of a party to an action setting out what he expects to prove, whereas evidence is a species of probative matter, legally presented at the trial of an issue, by the act of the parties and through the medium of witnesses, records, documents, concrete objects, etc., for the purpose of inducting belief in the minds of the court or jury as to the contention sought to be proved (fitness). Consequently, a show cause hearing contains only allegations, not evidence. The Court in *NA 2* (*NAVL II*) recognized this distinction when it stated as to a nexus determination:

> Within the limits of its discretion, [the ICC] may find that the fitness investigation is indeed relevant to the determination of pending applications; it may determine that the potential harm discernable *from the yet unproven charges* in the fitness investigation outweigh the public's need for immediate service.

The show cause hearing, therefore, will satisfy the procedural requirements of the APA for notice and hearing on the issue of cross-relevance, and by doing so will provide a record for whatever judicial review may be proper. (Footnotes omitted).

 Contrary to the ICC's position on this matter, however, the conclusion that the ICC's fitness flagging show-cause procedures satisfy the procedural requirements of the Administrative Procedure Act does not follow from the fact that unproven charges in fitness investigation of a carrier are the relevant concerns of a fitness flagging proceeding. Not every allegation of carrier misconduct made by the Bureau of Enforcement or Department of Transportation can serve to justify fitness flagging by providing the necessary connection between the fitness investigation of a carrier and the carrier's pending applications for operating authority. Otherwise, there would still be in effect the automatic flagging rule that was declared unlawful in *NAVL I, supra,* 386 F.Supp. 665, and *NAVL II, supra,* 412 F.Supp. 782. Only certain kinds of allegations of carrier misconduct in certain circumstances may justify the ICC's use of fitness flagging. The establishment of the nexus between the fitness investigation and a carrier's applications for operating authority, required before flagging is permissible, is a complex matter. As was stated by the *NAVL I* court,

> there are several complex factual issues involved concerning the significance of any link between the pending fitness investigation and the determinations which the Commission must make in passing upon plaintiff's applications for new operating authority in a different classification. How significant, in the context of the regulatory scheme and the effects upon the public, are the economic violations charged in the complaint initiating the Commission's fitness investigation of plaintiff? How much relationship as a matter of fact is there between the "household goods" operating authority and plaintiff's alleged economic violations while operating thereunder on the one hand, and plaintiff's requests for "new products" operating authority and expected future performance thereunder on the other? How critical is the public's immediate need for the requested new authority, and what is the expected delay if consideration of the requested new authority is postponed pending the fitness investigation? If postponement of consideration of requests for new authority is decided to be otherwise appropriate, how long should that postponement last?

386 F.Supp. at 677–78. In *Ex Parte 55* the ICC showed that it too was sensitive to the complex nature of the issues involved in establishing the required nexus.

> *Where relevant* we believe the following nexus criteria should provide a starting point for early show cause hearings: (1) commodity similarity, (2) territorial similarity, (3) time frame and frequency of the alleged violations (isolated instances or pattern of continuing violations), or (4) the seriousness of the alleged violations in light of the authority sought.

But the fact that there are complex issues involved in a fitness flagging proceeding

does not excuse compliance with the formal hearing requirements of the Administrative Procedure Act—quite the contrary. The fact that there are complex issues involved only reinforces the wisdom of having a hearing at which the Bureau of Enforcement or Department of Transportation bears the burden of justifying the flagging of a carrier's applications for operating authority and at which the carrier has the opportunity to submit oral and documentary evidence, to conduct cross-examination, to submit rebuttal evidence, and to submit proposed findings and conclusions. While it is true that the ICC must apply its expertise in this field, the operation of the Administrative Procedure Act in the area of fitness flagging insures that there are procedures to enable the carrier to be heard in a meaningful manner. "The decision whether to follow the Administrative Procedure Act is not a matter 'committed to agency discretion,' 5 U.S.C. § 70(a)(2)." *NAVL II, supra*, 412 F.Supp. at 803. Agency expertise and procedural requirements in the Administrative Procedure Act are complementary elements in a fair and effective system of administrative action and are not substitutes for each other.

We therefore hold that the fitness flagging show-cause procedures are invalid insofar as they do not incorporate the formal hearing requirements of 5 U.S.C. §§ 556 and 557.[16] *See Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948, 951 (6th Cir. 1971) (the issue of the validity of regulations may be raised in an enforcement proceeding when the validity of the regulations are directly involved in the case). The ICC's actions flagging Ligon's and Transamerican's applications for operating authority constituted agency action "unlawfully withheld" under 5 U.S.C. § 706(1), because it was agency action that was effected "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**V**

The second main issue on the merits in this case is whether the ICC abused its discretion in the application of fitness flagging to Ligon's and Transamerican's applications for operating authority. According to the ICC, it received Ligon's and Transamerican's applications and concluded that there was probable cause to believe that the allegations of violations by the carriers were so serious that if the allegations were true they would show a definite proclivity of the carriers not to abide by the Interstate Commerce Act and the ICC's rules and regulations.

■ We conclude, however, that the ICC did abuse its discretion in flagging Ligon's and Transamerican's applications. The problem is that we do not know how the ICC employed its expertise; the flagging orders give "no indication of the basis on which the Commission [the ICC] exercised its expert discretion." *Burlington Truck Lines, Inc. v. United States, supra*, 371 U.S. at 167, 83 S.Ct. at 245. *See NAVL II, supra*, 412 F.Supp. at 803.[17] Rather, they speak in conclusory terms of allegations of "the widespread and significant violations" committed by the carriers which constitute the nexus between the fitness investigations and the pending applications of those carriers. The orders do not disclose why there is such a nexus between the pending applications and alleged violations of law by the carrier, nor do they establish probable cause to believe that the allegations concerning violations by Ligon and Transamerican are serious in relation to their pending applications for operating authority.

In cases of fitness flagging, an administrative record that clearly reveals the agency's reasoning and analysis is especially im-

---

16. This holding would also apply to the final flagging regulations adopted insofar as they do not incorporate the formal hearing requirements of 5 U.S.C. §§ 556–57. It will be remembered that the final regulations substantially conformed to the interim regulations that were applied to Ligon and Transamerican.

17. The problem here is not that interim flagging regulations § 1109.2 and § 1109.9 are per se invalid but that the ICC has not complied with its own regulations so as to meet the requirements of the Administrative Procedure Act in 5 U.S.C. § 557(c).

portant. Fitness flagging is a deliberate policy of institutionalized delay with respect to applications for certificates of operating authority and as such must be carefully justified by the ICC because of the legal limitations on that kind of delay. 5 U.S.C. § 558(c) requires that "[w]hen application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons *and within a reasonable time,* shall set and complete proceedings . . . ." (Emphasis added.)

Furthermore, "there is great potential for abuse where a criterion for receiving a public license is an applicant's willingness to obey the agency's directives." *NAVL II, supra,* 412 F.Supp. at 792. The orders under review in the present case, by not complying with the Administrative Procedure Act, do not adequately safeguard against the potential for abuse of agency power in the context of fitness flagging.

Finally, without an administrative record that reveals the agency's reasoning and analysis, there is a danger that the ICC could continue to employ the automatic flagging rule that was declared unlawful in *NAVL I, supra,* 386 F.Supp. 665, and *NAVL II, supra,* 412 F.Supp. 782. Ligon and Transamerican do charge that in their cases the ICC used the fitness flagging procedures merely as a smokescreen for the continued use of an automatic flagging rule. Again we cannot dismiss the charge made by the carriers. In point of fact, despite the purported use of fitness flagging regulations by the ICC in this case, the ICC issued orders that flagged all the pending applications of those carriers, much in the same fashion as orders did before the institution of the fitness flagging procedures.

We therefore hold that the application of fitness flagging to Ligon and Transamerican constituted an abuse of discretion due to the failure of the ICC to issue decisions and provide administrative records that indicate the basis on which the ICC exercised its discretion to flag Ligon's and Transamerican's applications for operating authority. By so failing, the ICC "unlawfully withheld" action on Ligon's and Transamerican's applications under 5 U.S.C. § 706(1), because the manner in which the ICC withheld action constituted an abuse of discretion under 5 U.S.C. § 706(2)(A).[18]

## VI

Under 28 U.S.C. § 2342, this Court may enjoin, set aside, suspend, or determine the validity of rules, regulations and final orders of the ICC. Under 5 U.S.C. § 706(1), this Court may compel agency action unlawfully withheld or unreasonably delayed. Under 5 U.S.C. § 706(2), this Court can hold unlawful agency actions found to violate the procedural requirements of the law. In accordance with these grants of authority, we grant the following relief.

The ICC is permanently enjoined from employing a rule or procedure whereby consideration of the applications for operating authority submitted by Ligon and Transamerican is automatically stayed whenever another investigation or proceeding involving the carrier is inaugurated or reopened.

The ICC is permanently enjoined from flagging Ligon's and Transamerican's applications for operating authority on the basis of the fitness flagging procedures contained in or those which substantially conform to those contained in the ICC's order *Ex Parte 55.* It is hereby adjudged that those fitness flagging procedures are invalid under the Administrative Procedure Act.

The ICC is ordered to vacate the flagging order entered in each application of Ligon and Transamerican now before this Court. These applications are remanded to the ICC, which is ordered to grant or deny each such application within sixty days next fol-

---

**18.** This Court made a special request to counsel to brief the question of the applicability of the Supreme Court's decision in *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), because of our concern that the case would affect our conclusions in this case. After careful consideration of the views of counsel, however, we conclude that the *Yankee Power* decision has no impact in the present case.

lowing the entry of the decision of this Court.